# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP2397 & 2020AP112 |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin ex rel. Timothy Zignego, David W. Opitz and Frederick G. Luehrs, III, Plaintiffs-Respondents-Petitioners, v. Wisconsin Elections Commission, Marge Bostelmann, Julie Glancey, Ann Jacobs, Dean Knudsen and Mark Thomsen, Defendants-Appellants. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 391 Wis. 2d 441,941 N.W.2d 284
PDC No:2020 WI App 17 - Published

| | |
|---|---|
| OPINION FILED: | April 9, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 29, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Ozaukee |
| JUDGE: | Paul V. Malloy |

JUSTICES:
HAGEDORN, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiffs-respondents-petitioners, there were briefs filed by *Lucas T. Vebber, Richard M. Esenberg, Brian McGrath, Anthony LoCoco,* and *Wisconsin Institute for Law & Liberty*, Milwaukee. There was an oral argument by *Richard M. Esenberg.*

For the defendants-appellants, there was a brief filed by *Karla Z. Keckhaver, Steven C. Kilpatrick,* and *Colin T. Roth,*

assistant attorneys general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Joshua L. Kaul*.

An amicus curiae brief was filed on behalf of Felicia Ellzey, Marangelly Quintana Feliciano, Jennifer Hagen & SEIU Wisconsin State Council by *Jeffrey A. Mandell*, *Kurt M. Simatic*, and *Stafford Rosenbaum LLP*, Madison; with whom on the brief was *Stacie H. Rosenzweig* and *Halling & Cayo, S.C.*, Milwaukee.

An amicus curiae brief was filed on behalf of League of Women Voters of Wisconsin by *Douglas M. Poland* and *Rathje Woodward LLC*, Madison; with whom on the brief was *Jon Sherman* and *Fair Elections Center*, Washington, District of Columbia.

An amicus curiae brief was filed on behalf of The Public Interest Legal Foundation by *Eric J. Hatchell* and *Foley & Lardner LLP*, Madison; with whom on the brief was *Kaylan Phillips* and *Public Interest Legal Foundation*, Indianapolis, Indiana.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos.  2019AP2397 & 2020AP112
(L.C. No.  2019CV449)

STATE OF WISCONSIN                 :      IN SUPREME COURT

**State of Wisconsin ex rel. Timothy Zignego, David W. Opitz and Frederick G. Luehrs, III,**

    **Plaintiffs-Respondents-Petitioners,**

  v.

**Wisconsin Elections Commission, Marge Bostelmann, Julie Glancey, Ann Jacobs, Dean Knudsen and Mark Thomsen,**

    **Defendants-Appellants.**

**FILED**

**APR 9, 2021**

Sheila T. Reiff
Clerk of Supreme Court

---

HAGEDORN, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined.  REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, J., joined.

---

REVIEW of a decision of the Court of Appeals.  *Modified, and as modified, affirmed and cause remanded.*

¶1   BRIAN HAGEDORN, J.   Wisconsin law requires that its statewide voter registration list be updated regularly.  Before us is a dispute over one kind of voter-registration cleanup prescribed by law:  a statute requiring that the registration status of eligible voters ("electors" in the words of the statute) be changed when officials receive reliable information

that the elector moved out of their municipality. Wis. Stat. § 6.50(3) (2017-18).[1] This case does not concern the validity of this law or whether it should be complied with. Instead, the question we address today is whether § 6.50(3) places a positive and plain duty on the Wisconsin Elections Commission (the "Commission") to do what the law requires. We conclude it does not.

¶2 Wisconsin Stat. § 6.50(3) directs "the municipal clerk or board of election commissioners" to act when they receive "reliable information that a registered elector has changed his or her residence to a location outside of the municipality." In particular, "the municipal clerk or board of election commissioners" must send a letter regarding the move to the elector, and if the registered elector does not respond within 30 days, the "clerk or board of election commissioners shall change the elector's registration from eligible to ineligible status." § 6.50(3).

¶3 With limited exceptions, the judicial branch ordinarily does not order the executive branch to do its job. One limited vehicle by which it may do so is what is called a writ of mandamus. This is a remedy whereby a court may order a specific actor to take a certain action; but a court may do this only when the duty is positive and plain. The petitioners[2] in

---

[1] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[2] The petitioners in this case are Timothy Zignego, David W. Opitz, and Frederick G. Luehrs, III, all of whom are registered electors and taxpayers in Wisconsin.

this case (collectively, "Zignego") sought a writ of mandamus against the Commission and its commissioners[3] to carry out the commands of Wis. Stat. § 6.50(3) and change the registration of electors who may have moved. The circuit court[4] granted the writ, and later found the Commission and several commissioners in contempt after the Commission failed to comply.

¶4 The court of appeals reversed, concluding the writ of mandamus was granted in error, and we agree. Under Wis. Stat. § 6.50(3), the responsibility to change the registration of electors who may have moved out of their municipality is given to "the municipal clerk or board of election commissioners." Zignego argues that the Commission is a "board of election commissioners." This is plainly incorrect. Our election laws tell us how they will refer to the Commission: by use of the term "commission" (or occasionally "elections commission"). Wis. Stat. § 5.025. The "board of election commissioners" refers to a different kind of entity under our laws, one whose province is local. See Wis. Stat. §§ 7.20, 7.21, 7.22. In short, Zignego's argument that the Commission is required to carry out the mandates of § 6.50(3) is contrary to what the

---

[3] The respondents are the Wisconsin Elections Commission and Marge Bostelmann, Julie Glancey, Ann Jacobs, Dean Knudsen, and Mark Thomsen, five of the six commissioners sued solely in their official capacities. The sixth commissioner at the time of these events was Jodi Jensen, but she resigned prior to the initiation of this suit and her successor is not named as a party to this case.

[4] The Honorable Paul V. Malloy, Ozaukee County Circuit Court, presiding.

3

statute says because the statute assigns its duties to municipal election officials. The Commission has no statutory obligation, and therefore no positive and plain duty, to carry out the requirements of § 6.50(3). The circuit court therefore erred by issuing a writ of mandamus ordering it to do so.

¶5 The circuit court's contempt order against the Commission and several of its commissioners likewise must be reversed. The contempt order imposed remedial sanctions aimed at present and future compliance with the writ——a daily forfeiture beginning the date the contempt order was signed. But remedial sanctions cannot remain for failure to obey what we have determined was an unlawful writ of mandamus. That said, while we reverse the contempt order, we remind the Commission that waiting for an appellate court to grant a stay or reverse a circuit court order it disagrees with does not justify ignoring that order.

¶6 In sum, while Wis. Stat. § 6.50(3) requires that the registration status be changed for those who move out of their municipality, it gives this responsibility to municipal election officials, not to the Commission. Therefore, we affirm[5] the decision of the court of appeals reversing the circuit court's writ of mandamus and contempt orders.

---

[5] While we affirm the underlying decision of the court of appeals to reverse both orders issued by the circuit court, we withdraw portions of the court of appeals decision, as explained below.

4

## I. BACKGROUND

¶7 The issues in this case arose when the Commission received a "movers report" from the Electronic Registration Information Center, Inc. (ERIC), a multi-state consortium created to improve the accuracy of voter registration systems. This report identifies currently registered voters who may no longer be eligible to vote at their registered address because they either died or moved. After receiving the report, the Commission conducted internal vetting and, in October 2019, sent notices to approximately 230,000 Wisconsin voters who the report suggested may no longer reside at their registered address. These notices informed the recipients that they could affirm their address by: (1) doing so at myvote.wi.gov; (2) returning the attached postcard to their municipal clerk; or (3) voting at the next election.

¶8 Less than two weeks after the notices were mailed, Zignego filed a verified complaint with the Commission pleading that the Commission deactivate non-responsive electors pursuant to the 30-day timeframe outlined in Wis. Stat. § 6.50(3). The Commission dismissed this complaint without prejudice as untimely filed, in part because the Commission considered and discussed the mailings at its meetings in March and June of 2019.

¶9 Zignego then filed suit against the Commission and five of its commissioners seeking a declaration and temporary and permanent injunctive relief, or in the alternative, a writ of mandamus. The circuit court conducted a hearing on December

5

13, 2019, and orally ruled that a writ of mandamus would issue ordering the Commission to comply with Wis. Stat. § 6.50(3). The written mandamus order followed shortly thereafter compelling the Commission to "deactivate the registration of those electors who have failed to apply for continuation of their registration within 30 days of the date the notice was mailed."

¶10 The issuance of the writ of mandamus triggered a flurry of filings appealing the order to the court of appeals, petitioning for bypass to this court, and seeking a stay. The Commission, however, took no action to comply with the writ. Zignego followed with a motion asking the circuit court to hold the Commission and its commissioners in contempt. On January 13, 2020, the circuit court conducted a hearing and found the Commission and several commissioners in contempt. The court imposed, as a remedial sanction, a forfeiture of $50 per day against the Commission and a forfeiture of $250 per day against each of the three commissioners who voted to take no action to comply with the writ.[6]

¶11 That same day, the Commission filed a notice of appeal with respect to the contempt order and moved for a stay. Also on the same day, this court denied Zignego's petition for bypass. The next morning, the court of appeals stayed both the

---

[6] The Commission met on December 16, 2019, and considered a motion to comply with the circuit court's mandamus order, but that motion failed in a 3-3 vote. The Commission met again on December 30, 2019, and once more took no action to comply with the mandamus order.

6

contempt order and the writ of mandamus, explaining that the court's reasoning would be set forth in a subsequent order. A week later, the court of appeals issued its opinion and reversed the circuit court's writ of mandamus and contempt orders. State ex rel. Zignego v. WEC, 2020 WI App 17, 391 Wis. 2d 441, 941 N.W.2d 284. Zignego petitioned this court for review, which we granted.

## II. DISCUSSION

¶12 The dispositive question in this case is whether the Commission can be ordered to carry out the requirements of Wis. Stat. § 6.50(3).[7] This is a question of statutory interpretation we review de novo. Mueller v. TL90108, LLC, 2020 WI 7, ¶11, 390 Wis. 2d 34, 938 N.W.2d 566. When interpreting statutes, we focus primarily on the language of the statute, looking as well to its statutory context and structure. State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶¶45-46, 271 Wis. 2d 633, 681 N.W.2d 110. We begin with the broader

---

[7] The Commission argues Zignego does not have standing or a statutory right to bring this challenge. Because we reverse the mandamus and contempt orders on other grounds, we need not reach these questions.

Additionally, the Commission asserts that whether the movers report constituted sufficiently "reliable" information under Wis. Stat. § 6.50(3) involves a matter of judgment and discretion, meaning action based on this data cannot be compelled by a writ of mandamus. We also need not reach this question, and because we need not reach this question, we withdraw any language in the court of appeals decision deciding this issue.

statutory framework, and then apply these principles to the two orders in this case.

## A. Relevant Election Statutes
### 1. The Actors

¶13 Unlike many places around the country, Wisconsin has a highly decentralized system for election administration. Jefferson v. Dane County, 2020 WI 90, ¶24 n.5, 394 Wis. 2d 602, 951 N.W.2d 556. Rather than a top-down arrangement with a central state entity or official controlling local actors, Wisconsin gives some power to its state election agency (the Commission) and places significant responsibility on a small army of local election officials. Id.; see also https://elections.wi.gov/index.php/clerks (explaining that Wisconsin's 1,850 municipal clerks and 72 county clerks are each "a partner in the process of carrying out open, fair and transparent elections").

¶14 We begin in the same way the election statutes begin——by defining who the main actors are in this delicate democratic dance. The statutes regularly refer to and largely define three primary actors for our purposes here: (1) a "municipal clerk"; (2) a "board of election commissioners"; and (3) "the commission."

¶15 "Municipality" under the election statutes (chapters 5 through 12) refers to cities, towns, or villages. Wis. Stat. § 5.02(11). Consistent with this local focus, a "municipal clerk" is also a defined term in our election laws, and it

8

"means the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives." § 5.02(10). Municipal clerks are the officials primarily responsible for election administration in Wisconsin. As an instructional manual the Commission provides to municipal clerks explains:

> Elections in the State of Wisconsin are conducted at the local level. As a municipal clerk you are entrusted with the responsibility of ensuring fair, accessible, and transparent elections. Our job at the Wisconsin Elections Commission (WEC) is to provide you with a range of resources to support you in carrying out your duties.[8]

Our election laws give municipal clerks a vast array of duties and responsibilities consistent with their primary role in running Wisconsin elections.

¶16 The second main entity is a "board of election commissioners," whose powers, duties, and composition the statutes separately delineate in Wis. Stat. §§ 7.20, 7.21, and 7.22. Under § 7.20, "A municipal board of election commissioners shall be established in every city over 500,000 population," and a "county board of election commissioners shall be established in every county over 750,000 population." § 7.20(1). The statutes go on to describe their makeup and operation, including how many members a board of election commissioners shall have, how they are selected, and how long

---

[8] Wisconsin Elections Commission, Election Administration Manual for Wisconsin Municipal Clerks 5 (2020), https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Election%20Administration%20Manual%20%282020-09%29.pdf.

9

commissioners will serve. § 7.20(2)-(7). Under § 7.21, "All powers and duties assigned to the municipal or county clerk or the municipal or county board of canvassers under chs. 5 to 12 shall be carried out by the municipal or county board of election commissioners or its executive director" unless otherwise specified. And § 7.22 gives further duties and responsibilities to a municipal board of election commissioners.[9]

¶17 To translate, a board of election commissioners is established in our high population cities and counties——at this point, only in the City of Milwaukee and Milwaukee County——to carry out the duties otherwise accomplished by municipal and county clerks everywhere else.[10] It should therefore come as no surprise that the phrase "municipal clerk or board of election commissioners" appears in tandem all over our election statutes because this describes the duties of local election officials.

---

[9] Zignego argues that the phrase "board of election commissioners" is not a technical or specially-defined word or phrase. Therefore, Zignego maintains, it must be given its common, ordinary, and accepted meaning, which is broad enough to include the Commission. See State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. As we have explained, however, a "board of election commissioners" is most certainly a technical term under our statutes. See Wis. Stat. § 990.01(1) ("[T]echnical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning.").

[10] "'County clerk' includes the executive director of the county board of election commissioners and their authorized representatives." Wis. Stat. § 5.02(2). County clerks have distinct duties and responsibilities in administering Wisconsin's elections, several of which are provided in Wis. Stat. § 7.10.

10

In fact, this conjoined phrasing appears dozens of times in chapter 6 alone.[11]

¶18 The final entity relevant for our purposes is the Wisconsin Elections Commission. It has a separate defined nomenclature located in Wis. Stat. § 5.025. In chapters five through ten and 12 of the statutes, "'commission' means the elections commission." § 5.025.[12] Hundreds of times in the chapters following, the legislature uses either "commission" or occasionally, "elections commission," to denote the Commission. Immediately following this definition, Wis. Stat. § 5.05 extensively lays out various powers and duties of the Commission (other statutes add to this list). Among them, the Commission has general responsibility for administering chapters five through ten and 12, the power to investigate and prosecute violations of election laws, the duty and power to issue guidance and formal advisory opinions, and the charge to conduct voter education programs. § 5.05(1), (2m), (2w), (5t), (6a), (12). Of some relevance here, the Commission is also

---

[11] The administrative rules also tie these two together, showing that a board of election commissioners refers to a local body. In the Commission's administrative rules chapter on voter registration, "'Municipal clerk' has the meaning given in [§] 5.02(10), Stats., and includes the Milwaukee city board of election commissioners." Wis. Admin. Code § EL 3.01(8) (Feb. 2017).

[12] This definition of "commission" in Wis. Stat. § 5.025 was cited and relied on extensively by the court of appeals in its decision, yet it was not cited even once in Zignego's principal brief, and received only one isolated mention in its reply brief.

11

"responsible for the design and maintenance of the official registration list" and "shall require all municipalities to use the list in every election." § 5.05(15).

## 2. The Actors' Roles

¶19 With these three primary actors in mind, the statutes establish various duties and responsibilities for each election entity and official, often prescribing which actor is responsible for which action. We see this on full display in Wis. Stat. §§ 6.27-6.57, the subchapter concerning voter registration. A sampling of these statutes illustrates this delegation of responsibilities.

¶20 After elections, for example, "the municipal clerk or board of election commissioners shall submit electronically a report to the commission" and county election officials with information on who voted, absentee voting, and various statistics on voter registration. Wis. Stat. § 6.275(1). All three of our primary actors have a role under this statute. The two local entities, the municipal clerk and the board of elections commissioners, are directed to submit their report to the Commission.

¶21 Under Wis. Stat. § 6.36(1)(a), the Commission "shall compile and maintain electronically an official registration list." But editing the list is a different matter. The laws specify that the list must "be designed in such a way that the municipal clerk or board of election commissioners of any municipality . . . may, by electronic transmission, add entries

12

to or change entries on the list for any elector who resides in, or who the list identifies as residing in, that municipality and no other municipality." § 6.36(1)(c). Again, all three entities are mentioned. The Commission maintains the statewide list, but the municipal clerk or board of election commissioners must be able to change the registration status for individuals within their municipality.

¶22 We see this same pattern in the statutory section at issue in this case, Wis. Stat. § 6.50, which generally governs revisions to the voter registration list.

¶23 Subsections (1), (2), and (2g) outline a procedure whereby those who have not voted in the previous four years are changed to an ineligible status on the statewide registration list. Wis. Stat. § 6.50(1), (2), (2g). After a general election, the "commission" is required to examine the registration records and identify non-voting electors. § 6.50(1). The Commission then must mail a notice that tells the elector that their registration will be suspended unless the elector applies for continuation within 30 days. Id. If continuation of registration is not applied for within 30 days, "the commission shall change the registration status of that elector from eligible to ineligible." § 6.50(2). However, the "commission" may delegate changing of registration statuses "to a municipal clerk or board of election commissioners of a municipality." § 6.50(2g). Ultimately, the statutory responsibility to change the registration status for non-voting electors is squarely placed on the Commission.

13

¶24 Subsection (4) defines the process for removing deceased electors. Wis. Stat. § 6.50(4). This responsibility is given to the "municipal clerk or board of election commissioners." Id. Deceased electors are identified "by means of checking vital statistics reports," and "[n]o notice need be sent" before making these registration changes. Id.

¶25 Subsection (5) requires a change of registration status when a building is condemned, following an investigation "by the municipal clerk or board of election commissioners." Wis. Stat. § 6.50(5). Once again, it is "the clerk or board of election commissioners [that] shall change the elector's registration status." Id.

¶26 As these provisions make clear, Wis. Stat. § 6.50 sometimes directs the Commission to act, and other times it directs municipal officials to do so. And pursuant to subsection (7), "the commission, municipal clerk, or board of election commissioners shall make an entry on the registration list" "[w]hen an elector's registration is changed from eligible to ineligible status" and must "giv[e] the date and reason for the change." § 6.50(7).

¶27 While additional statutory context could be considered to reinforce the same themes, it is time we turn our attention to the subsection at issue here, Wis. Stat. § 6.50(3), which provides in full:

> Upon receipt of reliable information that a registered elector has changed his or her residence to a location outside of the municipality, the municipal clerk or board of election commissioners shall notify the

14

elector by mailing a notice by 1st class mail to the elector's registration address stating the source of the information.  All municipal departments and agencies receiving information that a registered elector has changed his or her residence shall notify <u>the clerk or board of election commissioners</u>.  If the elector no longer resides in the municipality or fails to apply for continuation of registration within 30 days of the date the notice is mailed, <u>the clerk or board of election commissioners</u> shall change the elector's registration from eligible to ineligible status.  Upon receipt of reliable information that a registered elector has changed his or her residence within the municipality, <u>the municipal clerk or board of election commissioners</u> shall change the elector's registration and mail the elector a notice of the change.  This subsection does not restrict the right of an elector to challenge any registration under [Wis. Stat. §§] 6.325, 6.48, 6.925, 6.93, or 7.52(5).

(Emphasis added.)  Zignego's primary argument in this case is that the Commission is a "board of election commissioners" under § 6.50(3).  This argument disregards nearly every foundational principle of statutory interpretation.

¶28 The subsection begins by focusing its attention on electors who have changed their "residence to a location <u>outside of the municipality</u>."  Wis. Stat. § 6.50(3) (emphasis added).  Thus, this subsection is not an instruction to update the registration statuses of all movers; it is only directed to those who have moved outside their municipality.  This demonstrates the local, rather than statewide, focus of § 6.50(3).

¶29 In four places, Wis. Stat. § 6.50(3) provides that the obligations imposed by this subsection apply to the municipal clerk or the board of election commissioners.  Not once does it refer to the Commission, despite references to the "commission"

15

seven times alone in the remainder of § 6.50.[13] As the surrounding context, definitions, and text make clear, these duties are the responsibility of municipal clerks and a municipal board of election commissioners. The Commission has no mandatory duties under § 6.50(3), and therefore cannot be compelled to act under this subsection.

### 3. Zignego's Counter-Arguments

¶30 Zignego responds with three additional arguments, none of which override or even challenge the plain reading of the law.

¶31 First, Zignego contends that Wisconsin's relationship with ERIC suggests the Commission is required to deactivate movers pursuant to Wis. Stat. § 6.50(3). Under Wisconsin law, Wisconsin's "chief election officer"——the "commission

---

[13] The Commission was created in 2015. See 2015 Wis. Act 118. Previously, the responsibility to change the registration status of non-voting electors in Wis. Stat. § 6.50(1) and (2) was given to the Government Accountability Board (GAB), the Commission's predecessor. Wis. Stat. § 6.50(1), (2) (2013-14); 2015 Wis. Act 118, § 266(10). The legislature amended § 6.50 and gave the responsibility to remove non-voting electors to the Commission, but conspicuously did not change the responsible governmental actor under subsection (3). 2015 Wis. Act 118, § 266(10); see also 2015 Wis. Act 118, §§ 76, 77 (amending § 6.50(2g) and (7) to replace "board" with "commission"); 2015 Wis. Act 261, § 63 (amending § 6.50(3) and making no change to the entities delegated authority). This suggests the legislature intended to leave this power with the municipalities as it had during the life of the GAB. The legislature's choice to amend only part, but not all, of § 6.50 illustrates the legislature understood the "commission" to be distinct from a "board of election commissioners."

16

administrator"——is required to "enter into a membership agreement with [ERIC]." Wis. Stat. § 5.05(3g), § 6.36(1)(ae)1. And the chief election officer must "comply with the terms of the [ERIC] agreement." § 6.36(1)(ae)2. The ERIC membership agreement, in turn, requires the Commission to initiate contact with electors whose "record is deemed to be inaccurate or out-of-date." This obligation, however, is different from the one tasked to "the municipal clerk or board of election commissioners" under § 6.50(3). To comply with the ERIC agreement, the Commission need only contact the electors. Section 6.50(3), on the other hand, requires much more than simply notifying the elector. These two moving-related requirements do not contradict each other. The Commission's compliance with Wisconsin's ERIC agreement and its statutory responsibilities under § 6.36 do not require or authorize judicial rewriting of § 6.50(3) to impose extratextual mandates on the Commission.

¶32 Second, Zignego points to the Commission's past practice as support for its interpretation. Although it is unclear from the record whether the Commission thought it was bound by Wis. Stat. § 6.50(3), it is true that the Commission cited that subsection when it sent out notices in 2017 and changed the registration of thousands of electors in 2018. Before us, the Commission refused to state whether it thought

17

its actions in 2018 were lawful.[14] However, even if those actions were unlawful, the remedy for alleged executive overreach is not a court order to continue acting unlawfully. Simply because an agency took action in the past does not mean its actions were legal, nor would it provide authority for this court to mandate agency action that the law itself does not sanction. It is the statutory text, not agency practice, that determines what the law requires an agency to do.[15]

¶33 Finally, Zignego raises a new argument not raised below——namely, that reading Wis. Stat. § 6.50(3) as the Commission frames it puts Wisconsin's election laws in violation of federal election law, specifically the Help America Vote Act of 2002 (HAVA). We normally do not consider arguments not raised in the lower courts. See Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35. Even so, this is a nonstarter.

---

[14] The court of appeals concluded the Commission's actions in 2017 and 2018 were unlawful. State ex rel. Zignego v. WEC, 2020 WI App 17, ¶90, 391 Wis. 2d 441, 941 N.W.2d 284. However, it is unclear whether the Commission has authority to undertake the duties in Wis. Stat. § 6.50(3) on municipalities' behalf based on some other statutory provision; the parties did not brief this question. Therefore, we do not opine on whether any other statutory sections may prove relevant in determining what the Commission may do. The question before us is simply what it must do under § 6.50(3). Accordingly, we withdraw the language from the court of appeals opinion which concludes the Commission's actions in 2017 and 2018 were unlawful.

[15] Moreover, we do not defer to an agency's conclusion of law. Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶¶3, 108, 382 Wis. 2d 496, 914 N.W.2d 21.

¶34 As an initial matter, to the extent the assertion is that federal law conflicts with state law, that raises a different kind of analysis, possibly implicating preemption. See Town of Delafield v. Cent. Transp. Kriewaldt, 2020 WI 61, ¶¶5-7, 392 Wis. 2d 427, 944 N.W.2d 819 (setting out preemption principles). No such arguments have been made here.

¶35 And on the merits, Zignego's argument lacks any sound basis. HAVA requires each state to implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). Wisconsin has done so; the Commission created and maintains the voter registration list. See Wis. Stat. § 5.05(15). Nothing about this arrangement precludes assigning local officials responsibility to make certain changes to the list. See Wis. Stat. § 6.36(1)(c). Not only does Wisconsin law require that local officials be allowed to make changes to the list, HAVA does too. 52 U.S.C. § 21083(a)(1)(A)(v)-(vii) (explaining that local election officials must be able to access and update the list).

¶36 Additionally, under HAVA, states not subject to the National Voter Registration Act—and Wisconsin is not[16]—"shall remove the names of ineligible voters from the computerized list in accordance with State law." 52 U.S.C. § 21083(a)(2)(A)(iii).

---

[16] Wisconsin is not subject to National Voter Registration Act of 1993 (NVRA) because it has election-day registration. 52 U.S.C. § 20503(b)(2); Wis. Stat. § 6.55(2).

Thus, HAVA provides that Wisconsin is to look to its own state law to ascertain how ineligible voters are removed from the statewide computerized list. In other words, HAVA simply points us back to Wisconsin law, which, as we have explained, is clear. Nothing in HAVA mandates the atextual reading Zignego advocates.

¶37 In short, according to the plain meaning supported by its statutory context, "board of election commissioners" under Wis. Stat. § 6.50(3) does not include the Commission. The Commission has no mandatory duties under this provision. We now apply this understanding to the two orders before us.

## B. Writ of Mandamus

¶38 The circuit court granted a writ of mandamus based on its interpretation that Wis. Stat. § 6.50(3) gave mandatory duties to the Commission. This court has previously described the basic principles of mandamus as follows:

> Mandamus is an extraordinary legal remedy, available only to parties that can show that the writ is based on a clear, specific legal right which is free from substantial doubt. A party seeking mandamus must also show that the duty sought to be enforced is positive and plain; that substantial damage will result if the duty is not performed; and that no other adequate remedy at law exists.
>
> This court will uphold a trial court's granting or denying a writ of mandamus unless the judge erroneously exercised discretion. A judge's discretion in issuing a writ of mandamus is erroneously exercised if based on an erroneous understanding of the law.

20

Lake Bluff Hous. Partners v. City of South Milwaukee, 197 Wis. 2d 157, 170, 540 N.W.2d 189 (1995) (citations and quotations omitted).

¶39 As the preceding analysis makes clear, Wis. Stat. § 6.50(3) does not give any duty to the Commission, much less a positive and plain duty. Therefore, the writ of mandamus compelling the Commission to comply with § 6.50(3) was erroneously granted and must be reversed.[17]

### C. Contempt

¶40 The circuit court also found the Commission and several commissioners in contempt for failing to comply with the writ of mandamus. The "purpose of contempt is to uphold the authority and dignity of the court." Carney v. CNH Health & Welfare Plan, 2007 WI App 205, ¶20, 305 Wis. 2d 443, 740

---

[17] The dissent agrees that the argument presented to us by Zignego is incorrect; Wis. Stat. § 6.50(3) does not impose a duty on the Commission. See dissent, ¶52. Instead, the dissent crafts a new argument on Zignego's behalf. In essence, the dissent argues that the statutory duty of the Commission to create, maintain, and administer Wisconsin's voter registration list means the Commission is responsible to ensure every law related to that list is carried out——whether the Commission is statutorily assigned the responsibility or not. Taking this argument further, the dissent concludes a court can order the Commission to carry out these duties through a writ of mandamus whenever a municipal clerk or board of election commissioners fails to fulfill a statutory duty assigned to these local election officials. This would be a rather remarkable expansion of the Commission's powers and responsibilities. More to the point, it bears no resemblance to our election administration laws that give the Commission more limited duties, as we have explained at length.

21

N.W.2d 625. A party may be found in contempt for, among other things, "intentional . . . [d]isobedience, resistance or obstruction of the authority, process or order of a court." Wis. Stat. § 785.01(1)(b); see also Ash Park, LLC v. Alexander & Bishop, Ltd., 2010 WI 44, ¶78, 324 Wis. 2d 703, 783 N.W.2d 294 ("A party's unwillingness to obey a court order is the very definition of contempt.").

¶41 When a party is found in contempt the court may impose either punitive or remedial sanctions. Wis. Stat. § 785.02; Carney, 305 Wis. 2d 443, ¶24. A punitive sanction is "imposed to punish a past contempt of court for the purpose of upholding the authority of the court," while a remedial sanction is "imposed for the purpose of terminating a continuing contempt of court." § 785.01(2)-(3).

¶42 Here, the circuit court imposed remedial sanctions. That is, the court ordered the Commission and certain commissioners who voted to take no action to comply with the writ to pay a prospective daily forfeiture to force compliance. The very next morning, the court of appeals stayed both the mandamus and contempt orders, and issued its decision reversing both orders promptly thereafter. Because we agree with the court of appeals that the writ of mandamus must be reversed, we must necessarily reverse the contempt order on which it was based as well. Remedial sanctions may not be imposed when a party is no longer in contempt of court. See Christensen v. Sullivan, 2009 WI 87, ¶¶54-55, 320 Wis. 2d 76, 768 N.W.2d 798. Zignego does not argue otherwise.

22

¶43 That said, we remind the Commission that its duty to comply with the circuit court's writ of mandamus was not relieved simply by seeking a stay before an appellate court.[18] See Tensfeldt v. Haberman, 2009 WI 77, ¶41, 319 Wis. 2d 329, 768 N.W.2d 641 ("If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal." (quoted source omitted)). Nevertheless, because the writ of mandamus was issued in error, we must affirm the court of appeals' reversal of the circuit court's contempt order.

## III. CONCLUSION

¶44 Wisconsin Stat. § 6.50(3) does not apply to the Commission; there is no credible argument that it does. Accordingly, the circuit court erred in granting a writ of mandamus based on an improper interpretation of § 6.50(3), and its contempt order cannot survive the reversal of the writ of

---

[18] We observe the Commission promptly sought a stay of the writ of mandamus and, upon receiving no response, renewed its motion to stay with the court of appeals immediately following Zignego's motion for contempt. The court of appeals held the motion to stay in abeyance pending a decision from this court on the petition for bypass. We denied the petition for bypass on the same day the circuit court issued its contempt order. The court of appeals then stayed both the mandamus and contempt orders the next morning.

mandamus. We affirm as modified[19] the decision of the court of appeals, and remand the cause to the circuit court for dismissal.[20]

*By the Court.*—The decision of the court of appeals is modified, and affirmed as modified, and the cause is remanded to the circuit court for dismissal.

---

[19] Specifically, we withdraw language from the court of appeals opinion deciding the legality of the Commission's conduct in 2017 and 2018 and the reliability of the ERIC data because these issues are not necessary to adjudicate this case. See supra ¶12 n.7; ¶32 n.14.

[20] Both causes of action the Petitioners advanced in their underlying complaint relied on the erroneous proposition that the "board of election commissioners" in Wis. Stat. § 6.50(3) includes the Commission. Because we conclude § 6.50(3) does not apply to the Commission, the Petitioners' complaint must be dismissed.

¶45  REBECCA GRASSL BRADLEY, J.   *(dissenting)*.

> To be free is to live under a government by law . . . . Miserable is the condition of individuals, danger is the condition of the state, if there is no certain law, or, which is the same thing, no certain <u>administration</u> of the law[.]

<u>Judgment in Rex vs. Shipley</u>, 21 St Tr 847 (K.B. 1784) (Lord Mansfield presiding) (emphasis added). For years, the Wisconsin Elections Commission (WEC) undertook responsibility for notifying voters of WEC's receipt of information indicating they had moved and therefore may need to register to vote using their new addresses. If a voter failed to confirm the validity of the registered address, WEC removed that voter from the rolls, in accordance with state law. In 2019, WEC decided to disregard the law and instead delay deactivation of ineligible voters for up to two years. The majority relieves WEC of its statutory obligations, determining that these duties actually belong to local election officials and not WEC. The majority's decision leaves the administration of Wisconsin's election law in flux, at least with respect to ensuring the accuracy of the voter rolls.

¶46 The majority is correct that, pursuant to Wis. Stat. § 6.50(3), "municipal clerk[s] or board[s] of election commissioners" have a statutory obligation to change an elector's registration from eligible to ineligible status if an elector has moved. In reading the election statutes in isolation, however, the majority misses the broader picture: under the full statutory scheme of Wisconsin's election laws,

1

WEC——the state's chief election commission——also has a statutory obligation to change the status of ineligible voters on the statewide voter registration list.

¶47 Wisconsin Stat. § 5.05(15) makes WEC "responsible for the design and maintenance of the official registration list" statewide and § 5.05(2w) gives WEC "responsibility for the administration of chs. 5 to 10 and 12." Recognizing WEC's responsibility to ensure the accuracy of the voter rolls ensures the state's compliance with the federal Help America Vote Act (HAVA), which Wisconsin is bound to follow. Reading these statutes as a whole reveals WEC's "positive and plain duty" to fulfill its statutory responsibility to change the status of ineligible voters; therefore, the circuit court properly issued a writ of mandamus——a conclusion that should come as no surprise to WEC considering it has routinely complied with this duty for years. The majority's circumscribed statutory interpretation leaves WEC off the hook for its violations of Wisconsin's election laws. I respectfully dissent.

I

¶48 Wisconsin, along with 29 other states and the District of Columbia, participates in a multi-state consortium designed to improve the accuracy of voter registration data, called the Electronic Registration Information Center (ERIC). As a member, Wisconsin provides ERIC with information concerning current driver's licenses and State ID cards issued by the Division of Motor Vehicles, as well as a list of currently registered voters in WEC's records. ERIC then compares this data to state and

2

national sources, including the Social Security Administration's Death Master List and the United States Postal Services' National Change of Address service. The data compiled in these sources is based upon information personally sent to these services by individual voters. ERIC then sends WEC a maintenance report indicating those registered voters who may no longer be eligible to vote at their registered addresses because they have either moved or died.

¶49 As documented in the record in this case, in 2017 ERIC sent WEC a maintenance report showing a list of registered voters for whom ERIC received data indicating they had moved and were no longer eligible to vote at their listed addresses. After reviewing this list to ensure its accuracy, WEC sent notices to those voters asking them to confirm whether they still lived at their registered addresses. With respect to voters who failed to confirm their addresses, WEC marked their registration records as ineligible and required those individuals to re-register before voting again. These actions demonstrate that WEC understood and embraced its duty under Wisconsin's election laws to maintain the voter rolls.

¶50 In 2019, ERIC sent WEC another maintenance report with a list of registered voters who ostensibly had moved. Again, WEC vetted this information to ensure its accuracy and subsequently sent notices to the affected voters. This time, however, for voters who did not confirm whether they still lived at their registered addresses, WEC did not promptly change its records to reflect these voters' ineligibility. Instead, WEC

3

decided to delay deactivation of these voters' registrations for up to two years, thereby knowingly permitting voters to cast ballots in multiple elections with invalid registrations. Wisconsin's applicable election laws had not changed.

¶51 Petitioners sued WEC and its members seeking declaratory and injunctive relief, as well as a writ a mandamus in order to compel WEC to comply with Wisconsin's election laws. In response, WEC alleged that "municipal clerk[s] and local board[s] of election commissioners" have the sole responsibility to change the eligibility of voters who have moved. The circuit court rejected this argument, issued a writ of mandamus, and ordered WEC to deactivate the registrations of electors who had moved. After a long and winding procedural road, the court of appeals reversed this decision, and we in turn granted review of this case.[1]

---

[1] Rather than resolving this issue of first impression promptly when presented to us, on January 13, 2020, this court rejected a petition to bypass the court of appeals, leaving "voter rights and election integrity in flux, with no final resolution of the uncertainty in the law likely until after four statewide elections and one special congressional election." State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)). After the case returned to this court on March 11, 2020, the court refused to hear oral arguments until September 29, 2020, denying Zignego's motion to expedite oral argument. As predicted, "the people of Wisconsin" were denied "a decision in this case until after every single one of Wisconsin's 2020 elections" came and went "including the presidential election in November" and more than "an entire year after petitioners' commencement of this time-sensitive appellate litigation." Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)).

¶52 The majority correctly concludes that Wis. Stat. § 6.50(3) requires "municipal clerk[s] and board[s] of election commissioners" to "change the elector's registration from eligible to ineligible status" "[u]pon receipt of reliable information that a registered elector has changed his or her residence to a location outside of the municipality." The majority stops there, ignoring WEC's duties under Wisconsin's election laws. See majority op., ¶32 n.14 (refusing to discuss WEC's general duties because "the parties did not brief this question"). Under the whole-text canon of statutory construction, however, "[t]he text must be construed as a whole." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012); State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted . . . not in isolation but as part of a whole.").

¶53 As a general matter, Wis. Stat. § 6.36(1)(a) requires WEC "to compile and maintain electronically an official registration list." (Emphasis added). Wisconsin Stat. § 5.05(15) expressly mandates that WEC "is responsible for the design and maintenance of the official registration list under s. 6.36." (Emphasis added). Although Wisconsin courts have never directly interpreted this statute, its interpretation is dispositive in this case. Indeed, "to maintain" is more than just an obligation to create a registration list or to electronically insert data; it is a duty to "maintain" its accuracy. The ordinary meaning of "to maintain" is to "to keep

5

in a condition of good repair or efficiency." Maintain, The American Heritage Dictionary (5th ed. 2011); see also Maintain, Black's Law Dictionary (6th ed. 1990) ("acts of repairs and other acts to prevent decline"); Kalal, 271 Wis. 2d 633, ¶53 (instructing courts to turn to dictionary definitions to understand the "common and accepted meaning" of statutory language).

¶54 Applying the legislature's plain language, to "maintain" the official registration list means WEC must ensure its accuracy. An interpretation that permits WEC to escape its statutory obligation to ensure the accuracy of the voter rolls would be absurd. Kalal, 271 Wis. 2d 633, ¶46 (stating that statutory language should be construed "reasonably, to avoid absurd or unreasonable results"). Among the express mandates of Wis. Stat. § 6.36, WEC must include in its list "the name and address of each registered elector in the state." Wis. Stat. § 6.36(1)(a)1. (emphasis added). If WEC receives reliable information from ERIC that a voter's address information is invalid (e.g., the voter has moved away from a municipality or from the state entirely, as ERIC informs), and in response WEC does nothing, WEC thereby fails to "maintain" this list in any substantive regard. WEC's neglect of the state's voter list threatens not only the rule of law but the integrity of Wisconsin's elections.

¶55 In addition to assigning WEC the responsibility for maintaining the voter registration list under Wis. Stat. § 5.05(15), the legislature also required WEC to accurately

6

maintain this list at the time it instructed WEC to join ERIC. In particular, Wisconsin's election laws require WEC "to enter into a membership agreement with Electronic Registration Information Center, Inc. [ERIC], for the purpose of <u>maintaining the official registration list</u>." Wis. Stat. § 6.36(ae)1 (emphasis added). The purpose of ERIC is "[to] assist state and local government units in making their voter registration lists and processes more accurate, more complete, and fully compliant with federal, state and local laws." Accordingly, by requiring WEC to enter into an agreement with ERIC, the legislature ensured that WEC would bear responsibility for maintaining an <u>accurate</u> registration list.

¶56 The membership agreement between WEC and ERIC reflects this obligation. In relevant part, the membership agreement states: "When the Member [WEC] receives credible ERIC Data (meaning the state has validated the data) indicating that information in an existing voter's record is deemed to be inaccurate or out-of-date, the Member [WEC] <u>shall</u>, at minimum, initiate contact with that voter in order to <u>correct the inaccuracy</u> or obtain information sufficient to <u>inactivate</u> or <u>update</u> the voter's record." (Emphasis added). The agreement defines "Member" as the chief election body in Wisconsin——not the municipal clerks or the municipal election commissions.[2]

---

[2] At the time of this agreement, the Government Accountability Board (GAB) administered Wisconsin's election laws. Accordingly, under the agreement, "Member" refers to the GAB. However, in 2015 Wisconsin dissolved the GAB, replacing it with WEC, which assumed the GAB's responsibilities under the agreement with ERIC.

7

Under the agreement, ERIC provides such data to WEC to enable WEC to reach out to voters, correct inaccurate information, and inactivate voter registrations in accordance with the law.[3] The agreement does not impose any responsibilities on municipal clerks or local boards of election commissioners. Instead, the legislature expressly tasked WEC with maintaining the list, and the ERIC agreement reflects this.

¶57 Both Wis. Stat. § 5.05(15) and the ERIC Agreement instruct WEC to inactivate ineligible voters, and Wis. Stat. § 5.05(2w) reinforces this responsibility. In full, § 5.05(2w) states that WEC "has the responsibility for the administration of chs. 5 to 10 and 12." (Emphasis added). This statute requires WEC to administer the mandates of Wis. Stat. § 6.50(3)——the statute requiring local entities to deactivate voters pursuant to ERIC's data. "Administration" does not mean WEC may stand idly by when it receives information indicating the ineligibility of voters to cast ballots using addresses where they no longer reside; rather, WEC must "carry on or execute" the legislature's explicit statutory directives. Administer, Oxford English Dictionary (6th ed. 2007); see Kalal, 271 Wis. 2d 633, ¶53. While municipal clerks and local boards of election commissioners have a duty under § 6.50(3), it is incumbent upon WEC to administer this law, which means WEC must execute it.

---

[3] The very fact that ERIC sends the data to WEC signals WEC's obligation to ensure the accuracy of voter rolls. If WEC does not share this data with local entities, the municipal clerks and boards of election commissioners could not possibly fulfill their statutory duties under Wis. Stat. § 6.50(3).

¶58 WEC understood this, at one point in time. For example, in 2017 WEC itself "follow[ed] the statutory process related to voters for whom there is reliable information that they no longer reside at their registration address (Wis. Stat. § 6.50(3))" as documented in a March 11, 2019 WEC memorandum to its members from Megan Wolfe, then interim administrator of WEC. The memorandum goes on to detail how "Commission staff vetted the [ERIC] list" and "WEC mailed a postcard to flagged voters directing them to reregister if they had moved or to sign and return the card to keep their registration current." The registrations of any voters "who did not return the postcard or update their registrations were deactivated" by WEC in January 2018, as were the registrations of voters "whose postcards were returned to the clerk as undeliverable." Notwithstanding Wis. Stat. § 6.50(3)'s applicability to municipal clerks and board of election commissioners, WEC once recognized its own, independent obligation under state and federal law to ensure the accuracy of Wisconsin's voter rolls.

¶59 In restricting its review of WEC's statutory obligations to Wis. Stat. § 6.50(3) alone, the majority commits a common but consequential error:

> Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts. Sir Edward Coke explained the canon in 1628: "[I]t is the most natural and genuine exposition of a statute to construe one part of the statute by another part of the same statute, for that best expresseth the meaning of the makers."

9

Scalia & Garner, supra, at 167 (quoting 1 Edward Coke, The First Part of the Institutes of the Laws of England § 728, at 381a (1628; 14th ed. 1791)). This canon of statutory construction has endured for centuries, and it counsels against reading a single statutory section in isolation. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." Id. Application of the canon in this case reveals WEC's statutory duty to maintain an accurate voter list statewide, and to execute the legislature's directives to remove ineligible voters from that list.

¶60 By establishing a centralized body tasked with maintaining and administering the statewide voter list, the legislature can "ensure that citizens are only registered in one place." Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 193 (2008) (quoted source omitted). Imposing such "safeguards" "inspires public confidence" in the election system and "confirms the identity of voters" in our state. League of Women Voters of Wisconsin Educ. Network, Inc. v. Walker, 2014 WI 97, ¶52, 357 Wis. 2d 360, 851 N.W.2d 302 (quoted source omitted). "Increased confidence in the elector system, in turn, encourages citizen participation in the democratic process." Id. (quoted source and internal marks omitted). For this reason, "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006). When WEC neglects its duty to properly administer the mandates of Wis. Stat.

10

§ 6.50(3), it jeopardizes the functioning of our participatory democracy. While WEC only now identifies municipal clerks and boards of election commissioners as the entities responsible for changing ineligible voters' registrations, WEC (and the majority) disregard WEC's role as the centralized election body in the state, which means the buck stops there.[4] See <u>Scott v. Schedler</u>, 771 F.3d 831, 839 (5th Cir. 2014).

¶61 This reading of Wis. Stat. §§ 5.05(15) and (2w) is buttressed by Wisconsin's obligations under HAVA. Although federal law does not dictate our interpretation of state law, it can nonetheless confirm our analysis. <u>Cf.</u> <u>Wisconsin's Envtl. Decade, Inc. v. Pub. Serv. Comm'n</u>, 79 Wis. 2d 409, 416-24, 256 N.W.2d 149 (1977) (confirming this court's interpretation of the Wisconsin Environmental Policy Act, which is "substantially patterned" after federal regulation). HAVA imposes on states a mandatory duty to deactivate ineligible voters, independent of state law.

¶62 "For many years, Congress left it up to the States to maintain accurate [voting] lists," until Congress shifted

---

[4] WEC also has a duty to investigate local entities' statutory violations. In relevant part, Wis. Stat. § 5.05(2m) states that "[t]he commission shall investigate violations of laws administered by the commission[.]" As explained, WEC has an affirmative duty to "administer" Wis. Stat. § 6.50(3); therefore, if local entities failed to fulfill their responsibilities under this provision, WEC had a duty to investigate. Of course, the record reflects that WEC usurped the duties statutorily assigned to municipal clerks and municipal boards of election commissioners under § 6.50(3), thereby ostensibly partaking in the violation of the laws WEC was entrusted to administer.

course. Husted v. A. Philip Randolph Inst., 138 S. Ct. 1833, 1838 (2018). In 2002, Congress enacted HAVA, which in part was created in order "to ensure that voter registration records in the State are accurate and updated regularly." 52 U.S.C. § 21083(a)(4). Toward this end, HAVA requires "each State, acting through the chief State election official, [to] implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). Accordingly, when WEC receives information from ERIC indicating that certain voters have moved and are therefore ineligible to vote at their registered addresses, WEC cannot simply sit on its hands. To the contrary, WEC has an obligation under federal law to maintain and administer the voter list, ensuring the accuracy of its content. Only WEC can comply with federal mandates to maintain Wisconsin's voter registration list "at the State level" and "in a uniform" manner, something 1,850 municipal clerks and boards of elections commissioners cannot possibly do separately and at the local level.

¶63 Congress enacted HAVA "to plac[e] primary responsibility [for voter registration lists] at the state level of government." Arthur L. Burris & Eric A. Fisher, The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election, Cong. Research Serv. 7 (Oct. 18, 2016). While "[e]arly U.S. elections were conducted

12

almost entirely locally," HAVA changed the game, "shift[ing] some responsibility for conducting elections to the state level." Karen K. Shanton, The State and Local Role in Election Administration: Duties and Structures, Cong. Research Serv. 7 (March 4, 2019). As the United States Supreme Court has recognized, Congress requires "[the] State to create and maintain a computerized list of all registered voters" and to "verify voter information contained in registration applications." Crawford, 553 U.S. at 192 (emphasis added).

¶64 The purpose of these mandates is straightforward: "to improve our country's election system." H.R. Rep. No. 107-329, at 31 (2001). As the "chief State election official" in Wisconsin, WEC has an essential role to play in this mission. See 52 U.S.C. § 21083(a)(1)(A). In particular, removing ineligible voters from the registration list is critical to "prevent[ing] voter fraud." Ortiz v. City of Philadelphia Office of the City Commissioners Voter Registration Div., 28 F.3d 306, 314 (3d Cir. 1994). A "State's interest in preserving the integrity of the electoral process is undoubtedly important," John Doe No. 1 v. Reed, 561 U.S. 186, 197 (2010), and it has a "strong interest in ensuring that its elections are run fairly and honestly." Taxpayers United for Assessment Cuts v. Austin, 994 F.2d 291, 297 (6th Cir. 1993) (citing Anderson v. Celebreeze, 460 U.S. 780, 788 (1983)). Indeed, retaining thousands of potentially illegitimate registrations on Wisconsin's voter lists substantially harms the integrity of elections and dilutes or even cancels votes of validly

13

registered citizens. Removing ineligible voters from this state's registration list is paramount if Wisconsin takes seriously its obligation to ensure fair and honest elections.

¶65 Even though Wisconsin's election statutes and HAVA require WEC to maintain the integrity and accuracy of the statewide voter registration list, WEC flagrantly violated both. Instead of making sure voter registrations were promptly deactivated "[i]f the elector no longer resides in the municipality or fails to apply for continuation of registration within 30 days of the date the notice is mailed" WEC decided to rewrite the law to give such voters "between 12 months and 24 months" after the notification was sent. Failing to follow the legislature's mandate——as WEC did in this very case——opens the door to voter fraud, erodes "[c]onfidence in the integrity of our electoral processes, . . . drive[s] honest citizens out of the democratic process, and breed[s] distrust of our government." Purcell, 549 U.S. at 8; see also Milwaukee Branch of NAACP v. Walker, 2014 WI 98, ¶72, 357 Wis. 2d 469, 851 N.W.2d 262 ("Protecting the integrity and reliability of the electoral process, maintaining public confidence in election results, and preventing voter fraud [are] significant and compelling [state] interests.") (internal quotations omitted). Maintaining accurate voter rolls is integral to the "functioning of our participatory democracy," and WEC failed to fulfill its statutory obligation to do so as the chief election body in this state. See id.

14

¶66 Reading Wis. Stat. §§ 5.05(15) and (2w) in harmony with HAVA and the ERIC Agreement, WEC had a "positive and plain duty" to change an elector's registration from eligible to ineligible status if the elector had moved, according to ERIC's data.[5] WEC fully understood its duty and acted on it in prior years. For example, in 2017 ERIC sent WEC a maintenance report showing a list of registered voters who apparently had moved and were no longer eligible to vote at their registered address. WEC reviewed the accuracy of this list, sent notices to the applicable voters, and changed the status of voters who did not respond. In contrast, in 2019 and 2020 WEC refused to undertake these mandatory updates, despite no intervening changes in applicable law.

¶67 During oral argument, when Attorney General Josh Kaul was asked whether WEC had a duty to deactivate voters regardless of the duties of local entities, he equivocated. In particular, he was asked: "The Commission still thinks it has the authority

---

[5] The majority misconstrues my analysis to mean that "a court can order the Commission to carry out" the statutory duties of a municipal clerk or board of election commissioners. Majority op., ¶39 n.17. Refusing to read Wisconsin's election laws as a whole, the majority entirely ignores WEC's own independent statutory duties. There is nothing "remarkable" in concluding that a court may issue a writ of mandamus ordering WEC to fulfill its obligations under the law. The majority characterizes this analysis as "craft[ing] a new argument on Zignego's behalf." Id. Construing the election statutes as a whole is not making an argument for any party; it is fulfilling this court's duty to interpret the law. "Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes[.]" Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 539 (1947).

15

[to deactivate voters]; does it rely on [its] general maintenance language in chapter 5?" Attorney General Kaul dodged the question, merely noting that this issue "raised a different question than the question here" and gave no answer one way or the other. Attorney General Kaul was later asked to clarify what duties WEC possesses under Wisconsin's election laws: "Do you agree or disagree with memorandum for the March 11, 2019 commission meeting prepared [by WEC's chief official] that . . . outlines the legal authority related to the recommended process [for WEC deactivating voters]?" Importantly, this memo acknowledged that "Wis. Stat. § 5.05(15) provides a broader source of statutory authority to the Commission for ensuring the integrity and maintenance of the statewide voter registration list, which supports the process [of deactivating voters] recommended by staff." Again, Attorney General Kaul evaded the issue, stating that the memo does "point to [WEC's] general maintenance obligation," but "how far this extends is not at issue."

¶68 As these exchanges and WEC's briefing to this court illustrate, we have been asked to disregard WEC's obligations under Wisconsin election law, merely because local entities have some role to play in deactivating voters. WEC's position is not only disingenuous, it also upends the statutory hierarchy of responsibilities. Both Wis. Stat. §§ 5.05(15) and (2w) require WEC, as the state's chief election body, to inactivate voters identified as ineligible by ERIC. Both HAVA as well as the ERIC Agreement impose this requirement on WEC and no other entity.

16

"How far [these duties] extend" is precisely the issue in this case. The law imposes a "positive and plain duty" on WEC to deactivate certain ineligible voters——and WEC most assuredly understood this, as its own conduct confirms, until its position changed in order to avoid accountability in this litigation.

¶69 Because WEC had a "positive and plain" duty under Wisconsin election laws, the circuit court properly issued a writ of mandamus.[6] "Mandamus is an extraordinary legal remedy" that is issued "to compel performance by a public officer of a duty which he is bound by law to perform." Eisenberg v. Estowski, 59 Wis. 2d 98, 102, 207 N.W.2d 874 (1973) (citation omitted). It was WEC's extraordinary dereliction of duty that warranted this extraordinary remedy. Certainly, Wis. Stat.

---

[6] Although the circuit court issued the writ of mandamus pursuant to Wis. Stat. § 6.50(3), WEC was nevertheless compelled to act pursuant to Wis. Stat. §§ 5.05(15) and (2w). It is well-settled law that even "[i]f a trial court reaches the proper result for the wrong reason it will be affirmed." State v. King, 120 Wis. 2d 285, 292, 354 N.W.2d 742 (Ct. App. 1984). "An appellate court is concerned with whether the decision . . . is correct, not whether . . . the circuit court's reasoning is. If the holding is correct, it should be sustained and this court may do so on a theory or on reasoning not presented to the lower court." Liberty Trucking Co. v. Dep't of Indus., Lab & Hum. Rels., 57 Wis. 2d 331, 342, 204 N.W.2d 457 (1973); see also Mueller v. Mizia, 33 Wis. 2d 311, 318, 147 N.W.2d 269 (1967). This general rule applies with equal force when circuit courts grant or deny writs of mandamus. See, e.g., State ex rel. Morke v. Record Custodian, Dep't of Health and Soc. Servs., 154 Wis. 2d 727, 454 N.W.2d 21 (Ct. App. 1990) (affirming the trial court's decision to deny a writ of mandamus because, even though the trial court relied on an erroneous interpretation of the "substantial damages requirement," the petitioner nonetheless did not have a "positive and plain duty" to act). Accordingly, because WEC was compelled to act pursuant to §§ 5.05(15) and (2w), even though the writ referenced § 6.50(3), the circuit court's decision must be upheld.

§§ 5.05(15) and (2w) instruct WEC to perform its "positive, plain, and unequivocal" responsibility to deactivate these voters——a duty it abandoned. State ex rel. Althouse v. City of Madison, 79 Wis. 2d 97, 106, 255 N.W.2d 449 (1977). Accordingly, the circuit court did not erroneously exercise its discretion when it issued the writ of mandamus. Lake Bluff Hous. Partners v. City of S. Milwaukee, 197 Wis. 2d 157, 170, 540 N.W.2d 189 (1995).

II

¶70 As the majority notes, the circuit court found WEC in contempt when it failed to comply with the writ of mandamus and imposed remedial sanctions. Despite WEC's willful defiance of the circuit court's order, the majority relieves WEC of those sanctions and merely "remind[s]" WEC that just because a party disagrees with a court order, it nevertheless must comply with it. Majority op., ¶5. Astonishingly, the majority is not the least bit troubled by WEC's refusal to obey a court order. The majority's feckless response dangerously signals to all litigants that they may defy circuit court orders without penalty, so long as they prevail on appeal.

¶71 In December 2019, the Ozaukee County Circuit Court issued a writ of mandamus ordering WEC "to comply with the provisions of § 6.50(3) and deactivate the registrations of those electors who have failed to apply for continuation of their registration within 30 days of the date the notice was mailed under that provision." The circuit court issued this ruling orally from the bench on December 13, 2019, and signed a

18

written order on December 17, 2019. Although this was indisputably an order of the court, WEC quite publicly refused to comply with it, thereby undermining the authority of the entire judicial branch.

¶72 Time was of the essence for WEC to comply with the circuit court's order because of the elections scheduled for February 18, 2020 and April 7, 2020——the first two of five elections in Wisconsin last year. Although WEC appealed the circuit court's order, a stay of the mandamus order was not in effect and therefore WEC was bound to obey the circuit court's order. See Wis. Stat. § 808.07(1) ("An appeal does not stay the execution or enforcement of the judgment or order appealed from except as provided in this section or as otherwise expressly provided by law."). WEC did not obey the order; it openly defied it.

¶73 As a result, petitioners returned to the circuit court to force WEC to comply with the mandamus order via a contempt motion. After a hearing on January 13, 2020, the circuit court found WEC and three of its commissioners——Julie Glancey, Anne Jacobs, and Mark Thomsen——in contempt for disobeying the writ of mandamus. The circuit court imposed remedial sanctions ordering each of those commissioners to pay a forfeiture of $250 and WEC to pay $50 per day until WEC complied with the writ of mandamus. The day after the circuit court issued the contempt order, on January 14, 2020, the court of appeals stayed both the mandamus order and the contempt order, without stating any reasons for doing so, much less any legal basis.

19

¶74 In addition to contaminating Wisconsin's elections, WEC's refusal to obey the circuit court's order harmed the integrity of Wisconsin's justice system. The court of appeals' stays in this case excused WEC's allegedly contemptuous conduct and signaled to the public that no one is bound by a circuit court order. Defiance of court orders, permitted by the court of appeals and now condoned by this court, threatens the integrity of our entire judicial system. "[T]he public interest in the enforcement of court orders . . . is essential to the effective functioning of our judicial process[.]" Valdez v. City and County of Denver, 878 F.2d 1285, 1289 (10th Cir. 1989). An orderly society depends upon citizens and government officials following the law. "If it is within the power of a party to an action . . . to flout the judgments of a court and act in contravention thereto, then our system of government is wholly ineffectual to protect the rights of parties to actions who have submitted themselves to the jurisdiction of its courts; hence the duty of a citizen who is a litigant to obey the order of the court." John F. Jelke Co. v. Hill, 208 Wis. 650, 662-63, 242 N.W. 576 (1932).

¶75 By imposing a stay on the contempt order before deciding the merits as to WEC's contempt, the court of appeals made a mockery of the rule of law in Wisconsin. While the court of appeals stayed the contempt order one day after the circuit court made it, WEC blatantly flouted the circuit court's writ for 32 days before an appellate court relieved it of its obligation to comply with it. "If a party can make himself a

20

judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450 (1911). The circuit court's contempt order should have remained in effect until an appellate court decided the merits of the circuit court's decision, and the sanctions should have been upheld regardless of the outcome. Instead, the majority effectively condones WEC's scorn for the judiciary by failing to even admonish WEC's brazen disrespect for the authority of our courts.

* * *

¶76 "This great source of free government, popular election, should be perfectly pure." Alexander Hamilton, Speech at New York Ratifying Convention (June 21, 1788), in Debates on the Federal Constitution 257 (J. Elliot ed. 1876). Our elections will not be perfectly pure until WEC is compelled to comply with Wisconsin's election laws and held to account when it fails to do so.

> "Elections are 'of the most fundamental significance under our constitutional structure.' Through them, we exercise self-government. But elections enable self-governance only when they include processes that 'giv[e] citizens (including the losing candidates and their supporters) confidence in the fairness of the election.'"

Republican Party of Pennsylvania v. Degraffenreid, ___ U.S. ___, 141 S. Ct. 732, 734 (2021) (Thomas, J., dissenting from denial

21

of certiorari) (quoting Illinois Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979) and Democratic National Committee v. Wisconsin State Legislature, ___ U.S. ___, 141 S. Ct. 28, 31 (Kavanaugh, J., concurring in denial of application to vacate stay)).

¶77 Wisconsin citizens expect more from their chief election body, and Wisconsin's election laws assuredly demand more. "It should be beyond question that the State has a significant and compelling interest in protecting the integrity and reliability of the electoral process, as well as promoting the public's confidence in elections." Milwaukee Branch of NAACP, 357 Wis. 2d 469, ¶73. In this case, WEC shirked its duty, flouted the circuit court's orders without consequences, and knowingly left ineligible voters on Wisconsin's voter rolls. WEC has a duty to maintain and administer Wisconsin's voter registration list under both state and federal law. Because the majority fails to recognize this or penalize WEC's contempt for the judicial system, I respectfully dissent.

¶78 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.