# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2024AP164 |

| | |
|---|---|
| COMPLETE TITLE: | Priorities USA, Wisconsin Alliance for Retired Americans and William Franks, Jr., Plaintiffs-Appellants, Governor Tony Evers, Intervenor-Appellant, v. Wisconsin Elections Commission, Defendant-Respondent, Wisconsin State Legislature, Intervenor-Respondent. |

ON BYPASS FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 5, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | May 13, 2024 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Ann M. Peacock |

JUSTICES:
ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and HAGEDORN, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiffs-appellants, there were briefs filed by *Diane M. Welsh*, and *Pines Bach LLP, Madison*; *David R. Fox* (pro hac vice), *Justin Baxenberg* (pro hac vice), *Richard A. Medina* (pro hac vice), *Omeed Alerasool* (pro hac vice), and *Elias Law Group LLP, Washington, D.C.* There was an oral argument by *David R. Fox*.

For the intervenor-appellant, there were briefs filed by *Erin K. Deeley*, *David P. Hollander*, *Rachel E. Snyder*, *Carly Gerads*, and *Stafford Rosenbaum LLP, Madison*; *Mel Barnes*, and *Office of Governor Tony Evers, Madison*; *Christine P. Sun* (pro hac vice), *Zack Goldberg* (pro hac vice), and *States United Democracy Center, New York, NY*. There was an oral argument by *Erin K. Deeley*.

For the defendant-respondent, there was a brief filed by *Charlotte Gibson*, assistant attorney general, *Faye B. Hipsman*, assistant attorney general, *Steven C. Kilpatrick*, assistant attorney general, with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Faye B. Hipsman*, assistant attorney general.

For the intervenor-respondent, there was a brief filed by *Misha Tseytlin*, *Kevin M. LeRoy*, *Sean T.H. Dutton*, *Emily A. O'Brien*, and *Troutman Pepper Hamilton Sanders LLP, Chicago, IL*. There was an oral argument by *Misha Tseytlin*.

An amicus curiae brief was filed by *Nicholas Fairweather*, and *Hawks Quindel, S.C., Madison*; *Graham Provost* (pro hac vice), and *Public Rights Project, Oakland, CA*, on behalf of Wisconsin Election Officials.

An amicus curiae brief was filed by *Lane E. Ruhland*, and *Ruhland Law and Strategy, LLC, Waunakee*, on behalf of Center for Election Confidence.

An amicus curiae brief was filed by *Matthew M. Fernholz*, and *Cramer Multhauf LLP, Waukesha*; *Thomas R. McCarthy* (pro hac vice), *Conor D. Woodfin* (pro hac vice), *R. Gabriel Anderson* (pro hac vice), and *Consovoy McCarthy PLLC, Arlington, VA*, on behalf

of The Republican National Committee, The Republican Party of Wisconsin, and RITE PAC.

An amicus curiae brief was filed by *Scott B. Thompson*, *Daniel S. Lenz*, and *Law Forward, Inc., Madison*, on behalf of Disability Rights Wisconsin, The League of Women Voters of Wisconsin, and Wisconsin Faith Voices for Justice.

An amicus curiae brief was filed by *Jason Myatt*, *Mark Cherry* (pro hac vice), *Zachary Goldstein* (pro hac vice), *Narayan Narasimhan* (pro hac vice), and *Gibson, Dunn & Crutcher LLP, New York, NY*; *Gregg J. Costa* (pro hac vice), and *Gibson, Dunn & Crutcher LLP, Houston, TX*, on behalf of Common Cause Wisconsin.

An amicus curiae brief was filed by *Richard M. Esenberg*, *Luke N. Berg*, *Nathalie E. Burgmeister*, and *Wisconsin Institute for Law & Liberty, Inc., Milwaukee*, on behalf of Richard Teigen, Richard Thom, and The Association of Mature American Citizens, Inc.

**2024 WI 32**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2024AP164
(L.C. No. 2023CV1900)

STATE OF WISCONSIN : IN SUPREME COURT

Priorities USA, Wisconsin Alliance for Retired Americans and William Franks, Jr.,

        Plaintiffs-Appellants,

Governor Tony Evers,

        Intervenor-Appellant,

    v.

Wisconsin Elections Commission,

        Defendant-Respondent,

Wisconsin State Legislature,

        Intervenor-Respondent.

**FILED**

**JUL 5, 2024**

Samuel A. Christensen
Clerk of Supreme Court

---

ANN WALSH BRADLEY, J., delivered the majority opinion of the Court, in which DALLET, KAROFSKY, and PROTASIEWICZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and HAGEDORN, J., joined.

---

    APPEAL from an order of the Circuit Court for Dane County, Ann M. Peacock, Judge. *Reversed and remanded.*

¶1 ANN WALSH BRADLEY, J. The petitioners, Priorities USA, Alliance for Retired Americans, and William Franks, Jr. (collectively, petitioners), have challenged several voting requirements on statutory and constitutional grounds. Among these was the requirement that absentee ballots be returned only by mail or in person to the clerk's office and not to a secure drop box.[1] The circuit court concluded that it was bound by Teigen v. Wisconsin Elections Commission, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519, in determining the legality of ballot drop boxes and accordingly granted a motion to dismiss that claim.[2]

¶2 After the petitioners sought bypass of the court of appeals, we granted bypass on a single issue: "Whether to overrule the Court's holding in Teigen v. Wisconsin Elections Commission, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519, that

---

[1] In addition to the drop-box ban at issue here, the petitioners also challenged the following: (1) the requirement that absentee voters vote in the presence of a witness, (2) the requirement that defects in absentee ballots be cured by election day, and (3) the interpretation of Wis. Stat. § 6.84 that purportedly treats "absentee votes as being less valuable and worthy of protection than in-person ballots cast on election day." None of these other challenges is at issue before us.

[2] This case arose in the circuit court for Dane County, Ann M. Peacock, Judge.

Wis. Stat. § 6.87 precludes the use of secure drop boxes for the return of absentee ballots to municipal clerks."[3]

¶3 The petitioners, along with intervenor Governor Tony Evers and respondent WEC, contend that Teigen was wrongly decided and ask that we overrule it. They specifically assert that Wis. Stat. § 6.87(4)(b)1. (2021-22),[4] contrary to the conclusion of the Teigen majority, allows the use of ballot drop boxes.

¶4 In contrast, the Wisconsin Legislature advances that we should reaffirm Teigen. It contends that the court's statutory interpretation in that case was correct and that no intervening changes should cause us to revisit that decision.

¶5 We conclude that Wis. Stat. § 6.87(4)(b)1. allows the use of ballot drop boxes. For the reasons set forth below, we determine that the court's contrary conclusion in Teigen was unsound in principle, and as a consequence, we overrule it.

¶6 Our decision today does not force or require that any municipal clerks use drop boxes. It merely acknowledges what

---

[3] The petitioners sought bypass on two additional issues: (1) "Whether laws that burden the right to vote, including by burdening absentee voting, are subject to strict scrutiny just like laws burdening other fundamental rights, such that the State must prove that the burden they impose is narrowly tailored to serve a compelling state interest," and (2) "Whether a voting law is immune from facial challenge where it imposes some unjustifiable burden on all voters it regulates, but some voters are more burdened than others." We denied bypass of these issues, and they are therefore not presently before the court.

[4] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

3

Wis. Stat. § 6.87(4)(b)1. has always meant: that clerks may lawfully utilize secure drop boxes in an exercise of their statutorily-conferred discretion. See Wis. Stat. § 7.15(1); State ex rel. Zignego v. WEC, 2021 WI 32, ¶¶13, 15, 396 Wis. 2d 391, 957 N.W.2d 208.

¶7 Accordingly, we reverse the order of the circuit court dismissing the petitioners' claim for a declaratory judgment that Wis. Stat. § 6.87(4)(b)1. allows the use of drop boxes and remand to the circuit court to reinstate the petitioners' drop-box claim.

I

¶8 We begin by setting forth the procedural posture of this case in greater detail. The petitioners challenged several election procedures. Part of their claim was a contention that "the Wisconsin Supreme Court should revisit its decision in Teigen and confirm that § 6.87(4)(b)1. allows the use of drop boxes consistent with the statutory text and constitutional principles."

¶9 WEC and the legislature moved to dismiss the complaint, arguing that the petitioners did not state a claim upon which relief may be granted.[5] The circuit court denied the motion in part and granted it in part. As relevant here, it agreed with WEC and the legislature and granted dismissal with respect to the drop-box claim. Specifically, the circuit court determined that it "doesn't have the authority to revisit the

---

[5] See Wis. Stat. § 802.06(2)(a)6.

4

soundness of the statutory interpretation in Teigen." It continued: "Even if I agree that Teigen was incorrectly decided, I must follow the Teigen precedent and I leave any revisiting of that decision to the Wisconsin Supreme Court."

¶10 The petitioners appealed and subsequently petitioned for bypass of the court of appeals.[6] As stated, we granted bypass of a single issue only: "Whether to overrule the Court's holding in Teigen v. Wisconsin Elections Commission, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519, that Wis. Stat. § 6.87 precludes the use of secure drop boxes for the return of absentee ballots to municipal clerks."

## II

¶11 We are called upon to review the circuit court's determination on a motion to dismiss. Whether a motion to dismiss was properly granted or denied is a question of law this court reviews independently of the determinations of the circuit court and court of appeals. State ex rel. City of Waukesha v. City of Waukesha Bd. of Rev., 2021 WI 89, ¶11, 399 Wis. 2d 696, 967 N.W.2d 460. A complaint survives a motion to dismiss for failure to state a claim upon which relief may be granted if it pleads facts, which if true, would entitle the plaintiff to relief. Cattau v. Nat'l Ins. Servs. of Wis., Inc., 2019 WI 46, ¶4, 386 Wis. 2d 515, 926 N.W.2d 756; Data Key Partners v. Permira Advisers, LLC, 2014 WI 86, ¶21, 356 Wis. 2d 665, 849 N.W.2d 693.

---

[6] See Wis. Stat. § (Rule) 809.60.

5

¶12 In our review, we interpret several Wisconsin statutes. Statutory interpretation presents a question of law we likewise review independently of the determinations rendered by the circuit court and court of appeals. Brown County v. Brown Cnty. Taxpayers Ass'n, 2022 WI 13, ¶19, 400 Wis. 2d 781, 971 N.W.2d 491.

### III

¶13 We begin by addressing the relevant election statutes, looking first to the language of those statutes. Next we proceed to analyze the interpretation advanced in Teigen and then engage in our independent examination of the statutory language. Finally, we examine whether stare decisis compels us to uphold Teigen.

### A

¶14 In examining the subject statutes, we begin with the statutory language. Sw. Airlines Co. v. DOR, 2021 WI 54, ¶22, 397 Wis. 2d 431, 960 N.W.2d 384 (citing State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110). If the meaning of the statute is plain, we need not inquire further. Id.

¶15 We give statutory language its "common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id., ¶23. Additionally, we "interpret statutory language 'in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to

6

avoid absurd or unreasonable results.'" Id. (quoting Kalal, 271 Wis. 2d 633, ¶46).

¶16 Wisconsin Stat. § 6.87, entitled "Absent voting procedure," sets forth requirements for the return of absentee ballots and the envelopes containing those ballots. The statutory language at the center of this case comes from Wis. Stat. § 6.87(4)(b)1., and is not extensive: "The envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." There is no assertion here that using a drop box is "mailing" a ballot, so we focus on the requirement that the ballot be "delivered in person, to the municipal clerk issuing the ballot or ballots."

¶17 In Teigen, the majority[7] interpreted this provision to ban drop boxes, concluding that "[a]n absentee ballot must be returned by mail or the voter must personally deliver it to the municipal clerk at the clerk's office or a designated alternate site." Teigen, 403 Wis. 2d 607, ¶4. Specifically, the Teigen majority highlighted the phrase "to the municipal clerk," determining that "[a]n inanimate object, such as a ballot drop box, cannot be the municipal clerk. At a minimum, accordingly,

_____

[7] Teigen was a split opinion, consisting of a majority/lead opinion, three concurrences, and a dissent. Although the entirety of the majority/lead opinion was not joined by a majority of justices, the portions of that opinion referred to here as the "majority" do represent the position of four justices. For further discussion of lead opinions, see Koss Corp. v. Park Bank, 2019 WI 7, ¶76 n.1, 385 Wis. 2d 261, 922 N.W.2d 20 (Ann Walsh Bradley, J., concurring).

7

dropping a ballot into an unattended drop box is not delivery 'to the municipal clerk[.]'" Id., ¶55.

¶18 It also looked to surrounding election statutes to support its result. First, the Teigen majority looked to Wis. Stat. § 6.84. Subsection (1) of this statute sets out the legislative policy that "voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place" that "must be carefully regulated to prevent the potential for fraud or abuse." Additionally, subsec. (2) indicates that § 6.87(4)'s provisions "shall be construed as mandatory." The Teigen majority took this to mean that it must strictly construe § 6.87's requirements for absentee voting with a skeptical eye, resulting in a prohibition against the use of drop boxes. See Teigen, 403 Wis. 2d 607, ¶53.

¶19 The majority in Teigen also looked to Wis. Stat. § 6.855, which governs alternate absentee ballot sites, in an attempt to bolster its analysis.[8] An "alternate absentee ballot site" is a location designated by the municipal clerk outside of the municipal clerk's office where voters may request, vote, and return absentee ballots. Trump v. Biden, 2020 WI 91, ¶56, 394 Wis. 2d 629, 951 N.W.2d 568 (Hagedorn, J., concurring). It

---

[8] Wisconsin Stat. § 6.855 allows the "governing body of a municipality" to "elect to designate a site other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election" and provides requirements for such sites.

concluded that an absentee ballot drop box is not an alternate absentee ballot site under § 6.855 "because a voter can only return the voter's absentee ballot to a drop box, while an alternate site must also allow voters to request and vote absentee at the site." Teigen, 403 Wis. 2d 607, ¶57. The majority continued:

> If ballot drop boxes are not alternate absentee ballot sites, 'what [are] they?' Trump v. Biden, 2020 WI 91, ¶101, 394 Wis. 2d 629, 951 N.W.2d 568 (Roggensack, C.J., dissenting). Existing outside the statutory parameters for voting, drop boxes are a novel creation of executive branch officials, not the legislature. The legislature enacted a detailed statutory construct for alternate sites. In contrast, the details of the drop box scheme are found nowhere in the statutes, but only in memos prepared by WEC staff, who did not cite any statutes whatsoever to support their invention.

Teigen, 403 Wis. 2d 607, ¶58.

¶20 We begin our independent analysis of the language of Wis. Stat. § 6.87(4)(b)1. by observing that the statute requires that a completed absentee ballot be "mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." In the petitioners' view, delivering a ballot to a drop box is a means of delivering it in person "to the municipal clerk." Taking a contrary position, the Teigen court drew a distinction between an inanimate object like a drop box and a "municipal clerk," a person to whom delivery must be made. Teigen, 403 Wis. 2d 607, ¶55. Yet, it also dismissed a distinction of even greater import——the distinction our statutes make between a "municipal clerk" and the "municipal clerk's office."

9

¶21 Throughout our election statutes there exist references to the "office of the municipal clerk," "office of the clerk," or the "clerk's office." When "office" is used in conjunction with a reference to the clerk, such "office" is specified as a place where a delivery or an action takes place. See, e.g., Wis. Stat. §§ 5.81(3) (discussing ballots and envelopes "voted in person in the office of the municipal clerk"); 6.18 (requiring that a form "shall be returned to the municipal clerk's office"); 6.32(2) (setting forth that an elector "appear at the clerk's office"); 6.855(2) (addressing the display of a notice "in the office of the municipal clerk"); 12.035(3)(d) (discussing a "building containing the office of the municipal clerk").[9]

¶22 On the other hand, "municipal clerk" is defined as "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives. Where applicable, 'municipal clerk' also includes the clerk of a school district." Wis. Stat. § 5.02(10). Synthesizing the above information regarding the "office" of the clerk with the statutory definition of "municipal clerk" leads to the conclusion that the two terms are

---

[9] See also Wis. Stat. §§ 6.15(2)(bm), 6.28(1)(b), 6.29(2)(a), 6.30(4), 6.32(3), 6.35(3), 6.45(1m), 6.47(2), 6.50(1), 6.55(2)(cm), 6.56(4), 6.86(1)(a)2., 6.86(3)(c), 6.87(3)(a), 6.87(4)(b)4., 6.88(1), 6.97(3)(b), 7.41(1), 7.53(1)(b), 7.53(2)(d), 8.10(6)(c), 12.03(1), 12.03(2)(a)2., 12.035(3)(c).

10

distinct. Put simply, the "municipal clerk" is a person, while the "office of the municipal clerk" is a location.

¶23 This principle must also apply to Wis. Stat. § 6.87 just as it does elsewhere in the statutes. "If a word or words are used in one subsection but are not used in another subsection, we must conclude that the legislature specifically intended a different meaning." Responsible Use of Rural and Agr. Land v. Pub. Serv. Comm'n, 2000 WI 129, ¶39, 239 Wis. 2d 660, 619 N.W.2d 888 (quoting Oney v. Schrauth, 197 Wis. 2d 891, 902, 541 N.W.2d 229 (Ct. App. 1995)). Had the legislature wanted to require delivery of an absentee ballot to a specific location, i.e., the clerk's office, it could have done so, and the wide usage of the term "clerk's office" throughout the election statutes certainly indicates that the legislature knew how to do so. See Southport Commons, LLC v. DOT, 2021 WI 52, ¶32, 397 Wis. 2d 362, 960 N.W.2d 17 ("The legislature is presumed to 'carefully and precisely' choose statutory language to express a desired meaning.").

¶24 It even tried to do so. In 2021, the legislature attempted to pass a revision to the language of Wis. Stat. § 6.87(4)(b)1. that would have seemingly accomplished the result it seeks in this case. Namely, the legislature voted on language requiring return of an absentee ballot "to the office of the municipal clerk issuing the ballot or ballots." 2021 S.B. 203, § 3. However, such language was vetoed by the Governor and accordingly never became law.

11

¶25 By mandating that an absentee ballot be returned not to the "municipal clerk's office," but "to the municipal clerk," the legislature disclaimed the idea that the ballot must be delivered to a specific location and instead embraced delivery of an absentee ballot to a person——the "municipal clerk." Given this, the question then becomes whether delivery to a drop box constitutes delivery "to the municipal clerk" within the meaning of Wis. Stat. § 6.87(4)(b)1.

¶26 We conclude that it does. A drop box is set up, maintained, secured, and emptied by the municipal clerk.[10] This is the case even if the drop box is in a location other than the municipal clerk's office. As analyzed, the statute does not specify a location to which a ballot must be returned and requires only that the ballot be delivered to a location the municipal clerk, within his or her discretion, designates. See Wis. Stat. § 7.15(1).

¶27 Such an interpretation of Wis. Stat. § 6.87(4)(b)1. is consistent with the discretion afforded to municipal clerks in running Wisconsin's elections at the local level. Election administration in this state is "highly decentralized." Zignego, 396 Wis. 2d 391, ¶13. "Rather than a top-down arrangement with a central state entity or official controlling

---

[10] Importantly, we observe that the statutory definition of "municipal clerk" includes "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives." Wis. Stat. § 5.02(10) (emphasis added). Thus, a single person need not set up, maintain, secure, and empty all drop boxes in a municipality.

local actors, Wisconsin gives some power to its state election agency (the Commission) and places significant responsibility on a small army of local election officials." Id.; see Wis. Stat. § 7.15(1) (setting forth that "[e]ach municipal clerk has charge and supervision of elections and registration in the municipality" and listing duties the clerk "shall perform," which includes "any others which may be necessary to properly conduct elections or registration"). Those local election officials, i.e., municipal clerks, are "primarily responsible for election administration in Wisconsin." Zignego, 396 Wis. 2d 391, ¶15.

¶28 Reading "to the municipal clerk" to reference a person rather than a location entrusts some discretion to municipal clerks in how best to conduct elections in their respective jurisdictions. Such discretion is consistent with the statutory scheme as a whole, under which Wisconsin's 1,850 municipal clerks serve the "primary role" in running elections via our "decentralized" system. Id., ¶¶13, 15. By endorsing a one-size-fits-all approach, the Teigen court arrived at a conclusion that runs counter to the statutory scheme as a whole. See Sw. Airlines, 397 Wis. 2d 431, ¶23 (indicating that statutory language must be interpreted "in the context in which it is used" and "not in isolation but as part of a whole").

¶29 The surrounding election statutes relied upon by the Teigen majority and proffered as support by the legislature here do not change this result. To begin, Wis. Stat. § 6.855 is of little use to the question presented. Section 6.855 allows a

13

municipality to designate alternate absentee ballot sites where "electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election." § 6.855(1). The Teigen majority noted that drop boxes are not alternate absentee ballot sites because ballots cannot be requested and voted at a drop box. Teigen, 403 Wis. 2d 607, ¶57. This is true. But this conclusion is ultimately of little consequence, as the statute simply does not apply to drop boxes.

¶30 "An alternative absentee ballot site . . . must be a location not only where voters may return absentee ballots, but also a location where voters 'may request and vote absentee ballots.'" Trump, 394 Wis. 2d 629, ¶56 (Hagedorn, J., concurring). On its face, this does not describe a drop box. The fact that the legislature "enacted a detailed statutory construct for alternate sites" while not doing the same for drop boxes has nothing to say about the legality of drop boxes. See Teigen, 403 Wis. 2d 607, ¶58. Indeed, the legislature would have no reason for enacting such a scheme because drop boxes are already allowed by the plain language of § 6.87(4)(b)1.

¶31 Similarly, Wis. Stat. § 6.84 does not warrant the import the Teigen court imparted on it. Contrary to the Teigen court's suggestion that it directs us to take a "skeptical" view of absentee voting, all § 6.84 does is set forth the consequences of a statutory violation. As will be addressed more fully infra, ¶¶41-46, § 6.84(2) states that the absentee ballot provisions must be construed as mandatory and that

14

ballots cast "in contravention" of those procedures "may not be counted." Construing a provision as mandatory rather than directory does not change the provision's meaning, nor require that any gloss, much less a "skeptical" one, be placed on its interpretation.

¶32 Section 6.84(1) is merely a declaration of legislative policy setting forth that "absentee balloting must be carefully regulated." The subsequent statutes do just that. See Wis. Stat. §§ 6.84-6.89. Again, nothing in subsec. (1) provides any rule of interpretation applying to the statutes that follow.

¶33 Had the legislature wanted to impose a rule of statutory construction on the absentee balloting statutes, it certainly knows how to do that. In several other areas of the law, the legislature has explicitly directed that statutes should be either liberally or strictly construed. As an example, Wis. Stat. § 19.81(4) does both within a single statute. § 19.81(4) ("This subchapter shall be liberally construed to achieve the purposes set forth in this section, and the rule that penal statutes must be strictly construed shall be limited to the enforcement of forfeitures and shall not otherwise apply to actions brought under this subchapter or to

15

interpretations thereof."). Further examples are plentiful.[11] The legislature did nothing of the sort with regard to absentee balloting, and it would be error to read in such a restriction where none is present. See Dawson v. Town of Jackson, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316 ("We decline to read into the statute words the legislature did not see fit to write.").

¶34 As the above analysis demonstrates, the Teigen court incorrectly interpreted Wis. Stat. § 6.87(4)(b)1. Accordingly, we conclude that Wis. Stat. § 6.87(4)(b)1. allows the use of ballot drop boxes.

B

¶35 Having concluded that the Teigen majority incorrectly interpreted the statute at issue, the next question becomes whether stare decisis nevertheless requires this court to uphold Teigen.

---

[11] See, e.g., Wis. Stat. §§ 49.498(7)(b) (setting forth assertions that a previous paragraph "may not be construed to do"); 70.109 (mandating that tax exemptions be strictly construed); 77.54(6)(cn) (directing that tax exemptions "under this subsection shall be strictly construed"); 111.15 (stating that in a statutory subchapter on employment relations, "nothing therein shall be construed so as to interfere with or impede or diminish in any way the right to strike or the right of individuals to work; nor shall anything in this subchapter be so construed as to invade unlawfully the right to freedom of speech. Nothing in this subchapter shall be so construed or applied as to deprive any employee of any unemployment benefit which the employee might otherwise be entitled to receive under ch. 108").

¶36 Stare decisis refers to the principle that requires courts to "stand by things decided." Hinrichs v. DOW Chem. Co., 2020 WI 2, ¶66 n.12, 389 Wis. 2d 669, 937 N.W.2d 37. Such a principle is "fundamental to the rule of law." Johnson Controls, Inc. v. Emp. Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257.

¶37 "Fidelity to precedent ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (cleaned up). Accordingly, any departure from stare decisis requires "special justification." Id.; State v. Johnson, 2023 WI 39, ¶¶19-20, 407 Wis. 2d 195, 990 N.W.2d 174.

¶38 However, stare decisis is "neither a straightjacket nor an immutable rule." Johnson Controls, 264 Wis. 2d 60, ¶100. It is not an "inexorable command." State v. Denny, 2017 WI 17, ¶71, 373 Wis. 2d 390, 891 N.W.2d 144. Indeed, "[w]e do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision." Johnson Controls, 264 Wis. 2d 60, ¶100.

¶39 Case law has identified several situations in which this court will overturn a prior case. "First, changes or developments in the law have undermined the rationale behind a decision." Id., ¶98. "Second, there is a need to make a decision correspond to newly ascertained facts." Id. "Third, there is a showing that the precedent has become detrimental to

17

coherence and consistency in the law." Id. We also consider "whether the prior decision is unsound in principle, whether it is unworkable in practice, and whether reliance interests are implicated." Id., ¶99.

¶40 Mere disagreement with the Teigen court's rationale is insufficient to overturn it——something more is required. Id., ¶93; Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶46, 281 Wis. 2d 300, 697 N.W.2d 417. Here, something more is present.

¶41 The "something more," which permeated the entirety of the Teigen majority's analysis, was its misinterpretation of Wis. Stat. § 6.84 and the "skeptical" gloss with which the court examined § 6.87(4)(b)1. As is partially explained above, see supra, ¶¶31-32, the Teigen court took what is a statute stating a legislative policy and dictating the consequences for a violation of the absentee balloting statutes and turned it into something else entirely. Instead, it treated § 6.84 as a principle of statutory interpretation that resulted in the distortion of the language of § 6.87 and that could have consequences for other election procedures.

¶42 Section 6.84 has two subsections. The first, entitled "Legislative policy," provides:

> The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged. In contrast, voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent electors who may

18

prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses.

Wis. Stat. § 6.84(1). The second, entitled "Interpretation," sets forth:

Notwithstanding s. 5.01(1), with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election.

§ 6.84(2).

¶43 The Teigen majority determined that these provisions together mandate a "skeptical" view of absentee voting. It saw the statement of legislative policy set forth in subsec. (1) as one that "cannot be reconciled with the statements of policy contained in WEC's memos" authorizing drop boxes. Teigen, 403 Wis. 2d 607, ¶53. Further, it divined from subsec. (2) the uncontroversial proposition that mandatory election requirements must be "strictly adhered to" and "strictly observed." Id. (citing State ex rel. Ahlgrimm v. State Elections Bd., 82 Wis. 2d 585, 592-93, 263 N.W.2d 152 (1978)).

¶44 Again, § 6.84 cannot carry the weight the Teigen majority assigns it. Subsection 1 provides that absentee balloting must be "carefully regulated." Indeed it is "carefully regulated"——through statutes passed by the legislature and signed by the governor, and which we have determined above permit the use of drop boxes. It is not up to

19

this court to "regulate" absentee voting. Such "regulation" falls to the legislative process and Wisconsin's 1,850 municipal clerks through our decentralized system of election administration. Further, by framing its analysis as a comparison between the "statement of legislative policy" in § 6.84(1) and the "statements of policy contained in WEC's memos" allowing drop boxes, Teigen, 403 Wis. 2d 607, ¶53, the Teigen court allowed policy concerns to alter the lens through which it viewed the statutory language, if not completely supplant the plain language of § 6.87(4)(b)1.

¶45 Subsection 2 indicates that any votes cast "in contravention of" the statutory procedures "may not be counted." This provision says nothing about what is prohibited——it merely sets out the consequence should a ballot be cast in a prohibited manner. In other words, § 6.84 gives us no principles of interpretation that give any insight into the actual meaning of the absentee balloting statutes that follow it. Observing that a statute must be "strictly adhered to," as the Teigen majority portrays, does not inform the meaning of the statute. We still must interpret it, and after we do, then we must ensure that it is being followed "strictly."[12] Our determination here is that

---

[12] The ramifications of the Teigen majority's "skeptical" view are evidenced by the apparent confusion it has caused among both parties and lower courts. An amicus brief filed in the present case by the Teigen plaintiffs contends that Wis. Stat. § 6.84 "command[s] that absentee ballot procedures are to be 'carefully regulated' and strictly construed . . . ." (Emphasis added). However, as described, there is a difference between strict adherence and strict construction, and the statute does not provide for the latter.

drop boxes are not "in contravention" of the statutory procedures, and § 6.84 does nothing to alter the statutory interpretation that led to this conclusion.

¶46 The Teigen court's error in this regard permeated its analysis to such a degree that its analysis was not merely wrong, but was unsound in principle. Essential to its conclusion was the assertion that "[i]nterpreting Wis. Stat. § 6.87(4)(b)1. to permit such methods of casting an absentee ballot would contravene the legislative policy expressed in Wis. Stat. § 6.84(1) and border on the absurd." Teigen, 403 Wis. 2d 607, ¶62. Additionally, it relied on the "detailed and unambiguous language of Wis. Stat. §[] 6.84" in determining that drop boxes are prohibited because they are a "mechanism not specified by the legislature." Id., ¶63. As a result of misinterpreting § 6.84, the Teigen court, despite the word "skeptical" appearing nowhere in the Wisconsin statutes, applied a "skeptical" gloss permeating its analysis, leading it astray and causing its analysis to be "unsound in principle."

¶47 We have previously stated a general principle that "stare decisis concerns are paramount where a court has

Similarly, WEC advances that circuit courts have interpreted the Teigen court's "skeptical" view as a broadly applicable principle of interpretation. See Brown v. WEC, Racine County Case No. 2022CV1324 (Jan. 10, 2024) (describing Teigen and Wis. Stat. § 6.84 as "suppl[ying] the lens through which absentee voting statues are to be viewed"); Kormanik v. WEC, Waukesha County Case No. 2022CV1395 (Nov. 29, 2023) (stating that the legislative policy language in § 6.84 "needs to be recognized as setting very firm guardrails to curb the analysis").

21

authoritatively interpreted a statute because the legislature remains free to alter its construction." Progressive N. Ins., 281 Wis. 2d 300, ¶45. Assuming such a principle applies here, stare decisis does not require us to uphold Teigen in this instance.[13]

¶48 An underlying purpose of strong adherence to stare decisis where a statute is involved is to protect reliance interests attendant to a precedential opinion. See id., ¶¶46-47; cf. Kimble v. Marvel Entertainment, LLC, 576 U.S. 446, 457 (2015). Here, no such reliance interests counsel in favor of upholding an erroneous interpretation of Wis. Stat. § 6.87(4)(b)1. Teigen has neither fostered reliance nor created a settled body of law.

¶49 Accordingly, we determine that the court's conclusion in Teigen, 403 Wis. 2d 607, that the subject statutes prohibit ballot drop boxes was unsound in principle, and as a consequence, we overrule it. Because the complaint sets forth allegations, which if true, would entitle the plaintiff to relief, the motion to dismiss the drop-box claim was wrongly denied.

---

[13] Contrary to the suggestion of the Legislature at oral argument, our decision in this case does not portend the death of statutory stare decisis. We strongly stand by our principles of stare decisis and our decision in this case to depart from precedent was not made casually. See State v. Stevens, 181 Wis. 2d 410, 442, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring).

¶50 We therefore reverse the order of the circuit court dismissing the petitioners' claim for a declaratory judgment that Wis. Stat. § 6.87(4)(b)1. allows the use of drop boxes and remand to the circuit court to reinstate the petitioners' drop-box claim.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded to the circuit court.

¶51 REBECCA GRASSL BRADLEY, J. *(dissenting).* The majority again forsakes the rule of law in an attempt to advance its political agenda. The majority began this term by tossing the legislative maps adopted by this court in Johnson v. Wisconsin Elections Commission, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559, for the sole purpose of facilitating "the redistribution of political power in the Wisconsin legislature." Clarke v. Wis. Elections Comm'n, 2023 WI 79, ¶302, 410 Wis. 2d 1, 998 N.W.2d 370 (Hagedorn, J., dissenting). The majority ends the term by loosening the legislature's regulations governing the privilege of absentee voting in the hopes of tipping the scales in future elections.[1]

¶52 Just two years ago, in Teigen v. Wisconsin Elections Commission, this court held "ballot drop boxes are illegal under Wisconsin statutes[,] [and] [a]n absentee ballot must be returned by mail or the voter must personally deliver it to the

---

[1] This case is not about whether drop boxes improve or hinder any political party's electoral fortunes or whether using drop boxes is a good policy. Those questions are reserved for resolution by the people's representatives in the legislature and irrelevant for purposes of statutory interpretation. See Teigen v. Wis. Elections Comm'n, 2022 WI 64, ¶52 n.25, 403 Wis. 2d 607, 976 N.W.2d 519 ("While the dissenters would permit ballot drop boxes, the court must respect the constitutional restraints on our power and refuse to act as a super-legislature. It poses a grave threat to democracy to mislead the people into believing we are one."); id., ¶151 (Hagedorn, J., concurring) ("Our obligation is to follow the law, which may mean the policy result is undesirable or unpopular."). It is "lamentable" my colleagues indulge their policy preferences at the expense of the law. See id., ¶¶205-07 (Ann Walsh Bradley, J., dissenting).

municipal clerk at the clerk's office or a designated alternate site." 2022 WI 64, ¶4, 403 Wis. 2d 607, 976 N.W.2d 519. Three of the justices making up today's majority dissented. Id., ¶¶205-48 (Ann Walsh Bradley, J., dissenting) (joined by Dallet and Karofsky, JJ.). The same dissenters, joined by the newest member of the court, form a majority in this case to overrule Teigen, converting the Teigen dissent into the new majority opinion and holding absentee ballots may be delivered virtually anywhere a municipal clerk designates. To reach this conclusion, the majority misrepresents the court's decision in Teigen, replaces the only reasonable interpretation of the law with a highly implausible one, and tramples the doctrine of stare decisis. I dissent.

I

¶53 Stare decisis——"to stand by the thing decided and not disturb the calm"[2]——is a foundational principle in the Anglo-American legal system.

> For it is an established rule to abide by former precedents, where the same points come again in litigation; as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from, according to his private sentiments: he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one.

---

[2] Ramos v. Louisiana, 590 U.S. 83, 115 (2020) (Kavanaugh, J., concurring in part).

1 William Blackstone, Commentaries *69. This venerable doctrine exists for the sake of stability in the law, to restrain the impulse of judges to overturn decisions with which they disagree. When judges instead indulge their preferences, every case is on the table as new judges take the bench, displacing the rule of law with the whim of judges. To avoid such volatility, "stare decisis beseeches judges to 'follow earlier judicial decisions when the same points arise again in litigation.'" Friends of Frame Park, U.A. v. City of Waukesha, 2022 WI 57, ¶55, 403 Wis. 2d 1, 976 N.W.2d 263 (Rebecca Grassl Bradley, J., concurring) (quoting stare decisis, Black's Law Dictionary 1696 (11th ed. 2019)). This court has articulated many times that it abides by the doctrine "scrupulously" because "respect for prior decisions is fundamental to the rule of law." Johnson Controls, Inc. v. Emps. Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257.

¶54 This court has declared: "'Stare decisis is the preferred course of judicial action because it promotes evenhanded, predictable, and consistent development of legal principles,'" Id., ¶95 (quoting State v. Ferron, 219 Wis. 2d 481, 504, 579 N.W.2d 654 (1998)), and "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals . . . ." Vasquez v. Hillery, 474 U.S. 254, 265 (1986). The decision-making process of this court cannot "become[] a mere exercise of judicial will . . . ." State v. Outagamie Cnty. Bd. of Adjustment, 2001 WI 78, ¶29, 244 Wis. 2d 613, 628 N.W.2d 376 (internal quotation

marks omitted) (quoting Citizens Util. Bd. v. Klauser, 194 Wis. 2d 484, 513, 534 N.W.2d 608 (1995) (Abrahamson, J., dissenting)). When the court "frequent[ly]" and "careless[ly]" overrules its prior decisions, its credibility suffers. Johnson Controls, 264 Wis. 2d 60, ¶95 (citing State v. Lindell, 2001 WI 108, ¶169, 245 Wis. 2d 689, 629 N.W.2d 223 (Abrahamson, C.J., dissenting)).

¶55 "'A court should not depart from precedent without sufficient justification.'" Id., ¶94 (quoting State v. Stevens, 181 Wis. 2d 410, 442, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring)). Our cases make clear prior decisions should not be "abandoned lightly." Outagamie Cnty., 244 Wis. 2d 613, ¶29 (citing Stevens, 181 Wis. 2d at 441 (Abrahamson, J., concurring)). "Overruling precedent is never a small matter." Kimble v. Marvel Ent., LLC, 576 U.S. 446, 455 (2015).

¶56 Our cases have customarily required a "special" or "compelling" justification before overturning a prior decision of this court. Johnson Controls, 264 Wis. 2d 60, ¶¶93, 96. In the past, this court has identified five special justifications for overruling precedent:

> (1) the law has changed in a way that undermines the prior decision's rationale; (2) there is a "need to make a decision correspond to newly ascertained facts;" (3) our precedent "has become detrimental to coherence and consistency in the law;" (4) the decision is "unsound in principle;" or (5) it is "unworkable in practice."

State v. Johnson, 2023 WI 39, ¶20, 407 Wis. 2d 195, 990 N.W.2d 174 (quoting State v. Young, 2006 WI 98, ¶51 n.16, 294 Wis. 2d 1, 717 N.W.2d 729). Predictably, the former dissenters,

4

who now find themselves in the majority, abuse the rule of law, replacing the majority opinion in Teigen with Justice Ann Walsh Bradley's dissent. They decree the decision "unsound in principle," emptying the phrase of any meaning and making it merely a mechanism to tip the scales of justice toward their preferred outcomes.

¶57 While the doctrine is the subject of much debate, the members of the majority purport to adhere to our traditional approach to stare decisis. By any measure, its decision violates the principles the majority professes to apply. Under its weakest application, stare decisis demands upholding Teigen.

¶58 Although the majority purports to "assum[e]" "'stare decisis concerns are paramount where a court has authoritatively interpreted a statute[,]'" the majority discards that principle as an inconvenient obstacle to its policy preferences. Majority op., ¶47 (quoting Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶45, 281 Wis. 2d 300, 697 N.W.2d 417). According to the majority, stare decisis receives heightened force only if reliance interests are present because "[a]n underlying purpose of strong adherence to stare decisis where a statute is involved is to protect reliance interests attendant to a precedential opinion." Id., ¶48. That is a gross misrepresentation of the principle the majority claims to apply. As Justice Brett Kavanaugh recently explained, stare decisis is "comparatively strict" for statutory interpretation cases "because Congress and the President can alter a statutory precedent by enacting new legislation." Ramos v. Louisiana, 590 U.S. 83, 118 (2020)

5

(Kavanaugh, J., concurring in part). Like the United States Supreme Court, this court has said stare decisis should receive extra consideration in statutory interpretation cases because the legislature may correct any errors in this court's interpretation. See, e.g., Progressive N. Ins. Co., 281 Wis. 2d 300, ¶45 (citing Hilton v. S.C. Pub. Rys. Comm'n, 502 U.S. 197, 202 (1991)) ("[S]tare decisis concerns are paramount where a court has authoritatively interpreted a statute because the legislature remains free to alter its construction."); Kimble, 576 U.S. at 456 (citing Patterson v. McLean Credit Union, 491 U.S. 164, 172-73 (1989)) ("[S]tare decisis carries enhanced force when a decision . . . interprets a statute. Then, unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees."). Scholarly sources are in accord. See, e.g., Bryan A. Garner et al., The Law of Judicial Precedent 333-35, 409-10 (2016).

¶59 The majority does not cite a single case suggesting the protection of reliance interests is an "underlying purpose" of according stare decisis additional weight in statutory interpretation cases. Giving stare decisis added heft when considering whether to overturn a decision that interpreted a statute is not universally observed; the principle is debatable. I have rejected the concept, "particularly when applied to interpretations wholly unsupported by the statute's text." See Manitowoc Co. v. Lanning, 2018 WI 6, ¶81 n.5, 379 Wis. 2d 189, 906 N.W.2d 130 (Rebecca Grassl Bradley, J., concurring); see

6

also <u>Gamble v. United States</u>, 587 U.S. 678, 723 (2019) (Thomas, J., concurring). The author of the majority opinion in this case has not. The majority's claim to adhere to this principle of stare decisis is disingenuous, and it should be transparent about changing the doctrine so dramatically. This case marks the "death of statutory stare decisis" in Wisconsin. The fact that the majority disputes the upshot of its decision only serves to prove it. <u>See</u> majority op., ¶47 n.13. The purpose of stare decisis is to protect the rule of law. <u>Citizens United v. FEC</u>, 558 U.S. 310, 378 (2010) (Roberts, C.J., concurring). By refusing to apply its own purported principle, while distorting it <u>sub silentio</u>, the majority perverts the rule of law.

¶60 Going forward, whether decisions that interpreted statutes receive extra stare decisis protection will depend solely on the will of four and the extent to which respecting or discarding the doctrine favors their preferred outcome. The majority may revive statutory stare decisis whenever the four find it convenient. Such manipulations of the doctrine will only prove what a "result-oriented expedient" today's decision is. <u>Lawrence v. Texas</u>, 539 U.S. 558, 592 (2003) (Scalia, J., dissenting).

¶61 Opinions that are "objectively wrong," <u>Pagoudis v. Keidl</u>, 2023 WI 27, ¶88, 406 Wis. 2d 542, 988 N.W.2d 606 (Rebecca Grassl Bradley, J., concurring in part, dissenting in part) (citing <u>Manitowoc Co.</u>, 379 Wis. 2d 189, ¶81 n.5 (Rebecca Grassl Bradley, J., concurring)), or "'demonstrably'" or "irrefutably" erroneous, <u>St. Augustine Sch. v. Taylor</u>, 2021 WI 70, ¶125, 398

7

Wis. 2d 92, 961 N.W.2d 635 (Rebecca Grassl Bradley, J., dissenting) (quoting Gamble, 587 U.S. at 711 (Thomas, J., concurring)), are unsound in principle and may be overruled. Koschkee v. Taylor, 2019 WI 76, ¶8 n.5, 387 Wis. 2d 552, 929 N.W.2d 600; State v. Reyes Fuerte, 2017 WI 104, ¶18, 378 Wis. 2d 504, 904 N.W.2d 773. But when a prior decision interpreted the law "within the range of permissible interpretations," the decision should generally stand. Gamble, 587 U.S. at 721 (Thomas, J., concurring); see St. Augustine Sch., 398 Wis. 2d 92, ¶¶124-25 (Rebecca Grassl Bradley, J., dissenting). The majority in this case must show more than it has been able to muster to justify overturning Teigen. Discarding a decision requires something more than saying the court was merely "mistaken" or the current majority sees the statute differently. Wenke v. Gehl Co., 2004 WI 103, ¶21, 274 Wis. 2d 220, 682 N.W.2d 405; see Progressive N. Ins. Co., 281 Wis. 2d 300, ¶¶50-51; Kimble, 576 U.S. at 455. A "garden-variety . . . disagreement does not suffice to overrule" a prior decision. Ramos, 590 U.S. at 121-22 (Kavanaugh, J., concurring in part). As one member of the current majority once put it, "The outcome of a case should not turn on whether the current members of the court find one legal argument more persuasive but, rather, on whether today's majority has come forward with the type of extraordinary showing that this court has historically demanded before overruling one of its precedents." State v. Roberson, 2019 WI 102, ¶97, 389 Wis. 2d 190, 935 N.W.2d 813 (Dallet, J., dissenting) (cleaned up) (quoting State

8

v. Lynch, 2016 WI 66, ¶101, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part, dissenting in part)). Having become an inconvenient obstacle to their agenda, the members of the new majority abandon yet another principle they once espoused.[3]

II

¶62 Teigen provided the best (or "fairest," Teigen, 403 Wis. 2d 607, ¶62) interpretation of Wis. Stat. § 6.87(4)(b)1., and the new majority fails to demonstrate its alternative interpretation is superior. It may prefer a different construction than Teigen's, but stare decisis commands the new majority nevertheless "acknowledge it as valid precedent" "despite [its] disagreement" with the decision. Lindell, 245 Wis. 2d 689, ¶145 (Ann Walsh Bradley, J., concurring).

¶63 The majority's principal argument against Teigen focuses on the heading introducing the discussion of Wis. Stat.

---

[3] This court has overruled prior opinions with alarming frequency this term. Of the fourteen opinions this court released resolving the merits, three (including this one) overruled at least one prior opinion of this court. Clarke v. Wis. Elections Comm'n, 2023 WI 79, 410 Wis. 2d 1, 998 N.W.2d 370 (overruling Johnson v. Wisconsin Elections Commission, 2021 WI 87, 399 Wis. 2d 623, 967 N.W.2d 469, Johnson v. Wisconsin Elections Commission, 2022 WI 14, 400 Wis. 2d 626, 971 N.W.2d 402, and Johnson v. Wisconsin Elections Commission, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559); Waukesha Cnty. v. M.A.C., 2024 WI ___, ___ Wis. 2d ___, ___ N.W.2d ___ (overruling Waukesha County v. S.L.L., 2019 WI 66, 387 Wis. 2d 333, 929 N.W.2d 140). That is, twenty-one percent of the opinions issued by this court this term overruled a prior decision. Last term, this court issued forty-four opinions resolving the merits, only one of which overruled a prior opinion of this court. In other words, only two percent of opinions last term overruled a prior opinion.

9

§ 6.84: "Legislative Policy Directs Us to Take a Skeptical View of Absentee Voting." Majority op., ¶41. Teigen must be overruled, the majority rationalizes, because taking a "'skeptical' view" of absentee voting, as directed by § 6.84, "permeated the entirety of the Teigen majority's analysis," rendering the decision somehow unsound in principle. Id., ¶¶41, 43; see also id., ¶46. That's a stretch. The word "skeptical" appears once in the entire opinion——in a header no less——and the term is merely shorthand for the legislative policy statement in § 6.84(1). Teigen mentions § 6.84 only twice in its analysis of the legality of drop boxes, and only as additional support for the analysis. Section 6.84 was in no sense "[e]ssential" for the court's conclusions. Id., ¶46. If the legislative policy statement did not exist, the court would have decided Teigen the exact same way.[4]

¶64 A second and more fatal blow to the majority's attempted take-down of Teigen is the majority's misunderstanding of Wis. Stat. § 6.84's role in statutory interpretation. Section 6.84(1) provides a statement of legislative policy for absentee voting:

> LEGISLATIVE POLICY. The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged. In contrast,

---

[4] Although the majority opinion in this case rehashes the arguments made by the dissent in Teigen——sometimes nearly word for word——the dissent in Teigen made no mention of the majority's invocation of Wis. Stat. § 6.84 in its analysis of the legality of drop boxes. If Teigen's use of § 6.84 permeated every aspect of the decision, rendering it unsound in principle, it is curious the dissenters noticed only now. Notably, the author of today's decision authored the dissent in Teigen too.

10

> voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place. <u>The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses</u>.

(Emphasis added.) While statutory policy statements cannot be used to contravene a statute's clear import, they may be used to inform the meaning of a statute's text. <u>Milwaukee Dist. Council 48 v. Milwaukee Cnty.</u>, 2019 WI 24, ¶21, 385 Wis. 2d 748, 924 N.W.2d 153; Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 217 (2012) ("A preamble, purpose clause, or recital is a permissible indicator of meaning."). That is exactly how <u>Teigen</u> utilized § 6.84(1). Interpretations directly contradicting § 6.84(1)'s statement that "voting by absentee ballot must be carefully regulated" are less favored than plausible interpretations of the statute in harmony with the statement.

¶65 The majority's assertion that Wis. Stat. § 6.84 cannot provide any interpretive insight because it does not specifically direct the court to apply a liberal or strict construction is baseless. <u>See</u> majority op., ¶32 (calling § 6.84(1) "merely a declaration of legislative policy" that does not "provide[] any rule of interpretation applying to the statutes that follow"). The majority cites nothing to support this newly created rule, which contradicts the very same majority's decision in <u>Catholic Charities Bureau, Inc. v. LIRC</u>,

11

authored just months ago by the same author of the majority opinion in this case. 2024 WI 13, ¶¶27-29, 411 Wis. 2d 1, 3 N.W.2d 666 (interpreting a tax exemption strictly because of a statutory public policy statement, found in Wis. Stat. § 108.01, that itself does not explicitly direct that the statutes should be strictly or liberally construed). In short, Teigen's reference to § 6.84 supplies no legitimate basis for overruling a recent decision of this court.[5]

### III

¶66 Aside from mischaracterizing Teigen in order to deem it "unsound in principle," the majority fails to put a dent in Teigen's interpretation of the statute. Wisconsin Stat. § 6.87(4)(b)1. requires an absentee ballot to be returned to the municipal clerk one of two ways: "The envelope shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." Teigen held the statute does not allow offsite, unattended drop boxes. Wisconsin Stat. § 5.02(10) defines "municipal clerk" as "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives. Where

---

[5] To bolster its argument, the majority suggests Teigen has caused "confusion" in the lower courts. Majority op., ¶45 n.12. This court recently accepted a petition for bypass in one of the circuit court decisions the majority critiques. Brown v. Wis. Elections Comm'n, No. 2024AP232, unpublished order (Wis. May 3, 2024) (granting the petition for bypass). The majority's criticism of the circuit court's decision is unnecessary. More importantly, it is generally inappropriate to cast aspersions on lower court decisions this court has only just agreed to review. It is also inappropriate to hide behind a party while doing so. See majority op., ¶45 n.12.

12

applicable, 'municipal clerk' also includes the clerk of a school district." Interpreting the clear text, Teigen recognized § 6.87(4)(b)1. requires an absentee voter to either send the absentee ballot by mail or "deliver[]" the ballot "to the municipal clerk"——a person, not an inanimate object——"in person." Teigen, 403 Wis. 2d 607, ¶55. To "deliver[]" something "to" another person, "in person," requires a person-to-person exchange. Id. That is what the statute means, and what it has always been understood to mean. Id., ¶175 (Hagedorn, J., concurring) (quoting 5 Wis. Op. Att'y Gen. 591, 593 (1916)) ("Less than a year after enactment [of the precursor to § 6.87(4)(b)1.], the attorney general opined on the precise interpretive question before us today: '"Delivery in person" must mean handed directly by an elector to the officer; it means manual transmission by the one to the other.'"); see also Sommerfeld v. Bd. of Canvassers of the City of St. Francis, 269 Wis. 299, 69 N.W.2d 235 (1955) (taking for granted the law was violated when voters returned absentee ballots through third parties). Requiring person-to-person transmission of the ballot under § 6.87(4)(b)1. obviously precludes the use of unattended drop boxes.

¶67 As Teigen also observed, other statutes contemplate only two locations at which a voter may deliver an absentee ballot in person: At the municipal clerk's office or at a designated "alternate site" under Wis. Stat. § 6.855.

> The governing body of a municipality may elect to designate a site other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality

13

> may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election. The designated site shall be located as near as practicable to the office of the municipal clerk or board of election commissioners and no site may be designated that affords an advantage to any political party. An election by a governing body to designate an alternate site under this section shall be made no fewer than 14 days prior to the time that absentee ballots are available for the primary under s. 7.15 (1) (cm), if a primary is scheduled to be held, or at least 14 days prior to the time that absentee ballots are available for the election under s. 7.15 (1) (cm), if a primary is not scheduled to be held, and shall remain in effect until at least the day after the election. If the governing body of a municipality makes an election under this section, no function related to voting and return of absentee ballots that is to be conducted at the alternate site may be conducted in the office of the municipal clerk or board of election commissioners.

§ 6.855(1) (emphasis added). As Teigen explained, § 6.855 "identifies the sites at which in person absentee voting may be accomplished——either 'the office of the municipal clerk' or 'an alternate site' but not both. 'An alternate site' serves as a replacement for 'the office of the municipal clerk' rather than an additional site for absentee voting." Teigen, 403 Wis. 2d 607, ¶59. Alternate sites are also carefully regulated by the legislature. They must be "located as near as practicable to the office of the municipal clerk or board of election commissioners and no site may be designated that affords an advantage to any political party." § 6.855(1). Given this detailed statutory language, § 6.855 does not contemplate in person absentee voting at a location other than the office of the municipal clerk or an alternate site, and the

explicit rules for alternate sites leave no reasonable room for in person absentee voting at any other locations.

¶68 This conclusion is reinforced by Wis. Stat. § 5.81(3), which like Wis. Stat. § 6.855(1), confirms that in person absentee voting will occur "in person in the office of the municipal clerk."

> If a municipality utilizes an electronic voting system in which ballots distributed to electors are employed, absentee ballots may consist of ballots utilized with the system or paper ballots and envelopes voted in person in the office of the municipal clerk or voted by mail.

§ 5.81(3)(emphasis added). "The legislature did not contemplate absentee ballots 'consist[ing]' of ballots cast via a drop box." Teigen, 403 Wis. 2d 607, ¶60 (alteration in original). The legislature's policy choices, enacted in §§ 6.855(1) and 5.81(3), prescribe only two locations where in person absentee ballots can be delivered——the office of the municipal clerk or a designated alternate site.

¶69 The Legislature, as intervenor-respondent, points to another statute that lends support for Teigen's interpretation. Wisconsin Stat. § 7.41(1) provides members of the public the right to observe in person absentee voting:

> Any member of the public may be present at any polling place, in the office of any municipal clerk whose office is located in a public building on any day that absentee ballots may be cast in that office, or at an alternate site under s. 6.855 on any day that absentee ballots may be cast at that site for the purpose of observation of an election and the absentee ballot voting process, except a candidate whose name appears on the ballot at the polling place or on an absentee ballot to be cast at the clerk's office or alternate site at that election. The chief inspector or

15

municipal clerk may reasonably limit the number of persons representing the same organization who are permitted to observe under this subsection at the same time. Each person permitted to observe under this subsection shall print his or her name in and sign and date a log maintained by the chief inspector or municipal clerk for that polling place, office, or alternate site.

Like Wis. Stat. § 6.855(1), § 7.41(1) contemplates that absentee voters may deliver their ballots only at the office of the municipal clerk or an alternate site. The statutes simply do not envision in person delivery of absentee ballots at any other locations. The majority offers no response to the Legislature's argument.

¶70 Providing even further textual support, Justice Hagedorn's concurrence in <u>Teigen</u> highlighted Wis. Stat. § 6.88,[6]

---

[6] Wisconsin Stat. § 6.88(1) and (2):

(1) When an absentee ballot arrives at the office of the municipal clerk, or at an alternate site under s. 6.855, if applicable, the clerk shall enclose it, unopened, in a carrier envelope which shall be securely sealed and endorsed with the name and official title of the clerk, and the words "This envelope contains the ballot of an absent elector and must be opened in the same room where votes are being cast at the polls during polling hours on election day or, in municipalities where absentee ballots are canvassed under s. 7.52, stats., at a meeting of the municipal board of absentee ballot canvassers under s. 7.52, stats." If the elector is a military elector, as defined in s. 6.34 (1), or an overseas elector, regardless of whether the elector qualifies as a resident of this state under s. 6.10, and the ballot was received by the elector by facsimile transmission or electronic mail and is accompanied by a separate certificate, the clerk shall enclose the ballot in a certificate envelope and securely append the completed certificate to the outside of the envelope before enclosing the ballot in the carrier envelope. The clerk shall keep the ballot in the clerk's office or at the alternate site, if applicable until delivered,

16

which "prescribes what happens after an absentee ballot is received by the clerk." Teigen, 403 Wis. 2d 607, ¶180 (Hagedorn, J., concurring). As Justice Hagedorn observed, § 6.88(1) "ensures a strict chain of custody for ballots" once delivered and § 6.88(2) "provides detailed instructions regarding the secure transfer of ballots from clerks to the proper election officials, ensuring there is no opportunity to tamper with the ballots." Id. "Given the detailed ballot custody regulations once the ballot arrives at the clerk's office or an alternate site, legislative silence with respect to ballots delivered anywhere else strongly indicates delivery is not permitted anywhere else." Id. (citing Alberte v. Anew Health Care Servs., Inc., 2000 WI 7, ¶17, 232 Wis. 2d 587, 605 N.W.2d 515).

---

as required in sub. (2).

(2) When an absentee ballot is received by the municipal clerk prior to the delivery of the official ballots to the election officials of the ward in which the elector resides or, where absentee ballots are canvassed under s. 7.52, to the municipal board of absentee ballot canvassers, the municipal clerk shall seal the ballot envelope in the carrier envelope as provided under sub. (1), and shall enclose the envelope in a package and deliver the package to the election inspectors of the proper ward or election district or, in municipalities where absentee ballots are canvassed under s. 7.52, to the municipal board of absentee ballot canvassers when it convenes under s. 7.52 (1). When the official ballots for the ward or election district have been delivered to the election inspectors before the receipt of an absentee ballot, the clerk shall immediately enclose the envelope containing the absentee ballot in a carrier envelope as provided under sub. (1) and deliver it in person to the proper election officials.

17

¶71 The majority in this case builds a straw man to attack Teigen. It insists Teigen conflated the phrases "to the municipal clerk" and "to the municipal clerk's office." See majority op., ¶20. Teigen did no such thing. That case held Wis. Stat. § 6.87(4)(b)1. is best read as requiring a person-to-person exchange of an absentee ballot between the voter and the municipal clerk. The court explained how Wis. Stat. §§ 6.855(1) and 5.81(3) restrict delivery of absentee ballots in person to the municipal clerk's office or a designated alternate site. Teigen never conflated the municipal clerk and the clerk's office.

¶72 The majority dismisses the relevance of Wis. Stat. § 6.855(1)——and simply ignores Wis. Stat. §§ 5.81(3), 7.41(1), and 6.88(1) and (2)——without ever grappling with the actual statutory text: In person delivery of a ballot can occur only at the municipal clerk's office or a designated alternate site. The majority's argument that the detailed and restrictive statute for the use of alternate sites says nothing about drop boxes because "drop boxes are already allowed" under Wis. Stat. § 6.87(4)(b)1. merely assumes the majority's conclusion rather than proves it. Id., ¶30. Given the detailed restrictions in § 6.855 on the use of alternate sites, the most plausible reading of the statute would preclude unmentioned methods of delivering absentee ballots; otherwise, there would be no reason whatsoever for the legislature to enact textual restrictions. The majority provides no rebuttal to this point.

18

¶73 The majority's reading of Wis. Stat. § 6.87(4)(b)1. is not impossible, just implausible, which is why a court committed to declaring the law rejected it and preserved the statute's historical meaning. For a more exhaustive exposition of the law, see Teigen, 403 Wis. 2d 607, ¶¶52-63. For a clearer glimpse of the policy preferences motivating the majority to rewrite the law more to its liking, see Justice Ann Walsh Bradley's dissent in Teigen, in which

> Justice Ann Walsh Bradley accuses the court of "erect[ing] yet another barrier for voters[.]" [B]ut to the extent any "barriers" to voting exist, they are of the legislature's making. Establishing rules governing the casting of ballots outside of election day rests solely within the power of the people's representatives because such regulations affect only the privilege of absentee voting and not the right to vote itself. Justice Ann Walsh Bradley says "[a] ballot drop box is a simple and perfectly legal solution to make voting easier[.]" While they might be a simple solution, the decision to devise solutions to make voting easier belongs to the legislature, not [the Wisconsin Elections Commission] and certainly not the judiciary. While the dissenters would permit ballot drop boxes, the court must respect the constitutional restraints on our power and refuse to act as a super-legislature. It poses a grave threat to democracy to mislead the people into believing we are one.

Id., ¶52 n.25 (some alterations in original) (internal citations omitted).

¶74 Despite the deceptively narrow framing of the majority's opinion, this case is not just about drop boxes. The majority offers no limiting principle for its interpretation of Wis. Stat. § 6.87(4)(b)1. The endeavor would fail because the majority's reading of the statute is boundless by design. The

19

majority dismantles the carefully regulated privilege of absentee voting in order to legitimize any method of getting absentee ballots to a municipal clerk that the clerk may choose. "[T]he statute does not specify a location to which a ballot must be returned and requires only that the ballot be delivered to a location the municipal clerk, within his or her discretion, designates." Majority op., ¶26. An unattended cardboard box on the clerk's driveway? An unsecured sack sitting outside the local library or on a college campus? Door-to-door retrieval from voters' homes or dorm rooms? Under the majority's logic, because the statute doesn't expressly forbid such methods of ballot delivery, they are perfectly lawful. This case is limited to the use of drop boxes "only if one entertains the belief that principle and logic have nothing to do with the decisions of this [c]ourt." Lawrence, 539 U.S. at 605 (Scalia, J., dissenting). While true of the majority's decision in this case, that's not how courts of law operate.

¶75 The majority's reading of Wis. Stat. § 6.87(4)(b)1. allows municipal clerks to create "monumentally different voting mechanism[s] not specified by the legislature." Teigen, 403 Wis. 2d 607, ¶63 (citing EPA v. EME Homer City Generation, L.P., 572 U.S. 489, 528 (2014) (Scalia, J., dissenting)). The majority would have us believe that buried within four innocuous words, "to the municipal clerk," is a delegation of vast power to municipal clerks to create an absentee voting regime unlike anything resembling the law. That is not how any reasonable reader——much less a judge——reads statutes. Legislatures do not

20

"hide elephants in mouseholes," Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001); that is, a reasonable reader assumes "the legislature 'does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions[.]'" Teigen, 403 Wis. 2d 607, ¶63 (alteration in original) (quoting Whitman, 531 U.S. at 468). The majority makes the municipal clerk the law giver.[7] Having constitutionally vested the legislative power in the legislature alone, the People never authorized this court to give the lawmaking power to anyone else.

IV

¶76 Nothing relevant has changed since this court decided Teigen two years ago. There have been no intervening changes in the facts or law to warrant overruling the decision. See Johnson, 407 Wis. 2d 195, ¶20. Nor has any evidence emerged demonstrating the decision is detrimental to the coherence of the law or unworkable in practice. Id. The policy-laden arguments against this court's decision in Teigen have not changed either; the majority in this case has simply recycled the dissent in Teigen, rebranding it the opinion of a court. Compare majority op., ¶¶20-23, with Teigen, 403 Wis. 2d 607, ¶¶219-23 (Ann Walsh Bradley, J., dissenting), and majority op.,

---

[7] See Teigen, 403 Wis. 2d 607, ¶58 ("Existing outside the statutory parameters for voting, drop boxes are a novel creation of executive branch officials, not the legislature. The legislature enacted a detailed statutory construct for alternate sites. In contrast, the details of the drop box scheme are found nowhere in the statutes, but only in memos prepared by WEC staff, who did not cite any statutes whatsoever to support their invention.").

¶¶29-30, with Teigen, 403 Wis. 2d 607, ¶¶227-29 (Ann Walsh Bradley, J., dissenting).  It does not deserve the title.

¶77 The only thing that has changed since Teigen is the court's membership.  Cf. Clarke, 410 Wis. 2d 1, ¶¶258-61 (Rebecca Grassl Bradley, J., dissenting).  As Justice Ann Walsh Bradley put it in a different case, "There has been no change in the relevant statutes, no change in the constitution, and no change in the underlying principles.  Nonetheless, the majority substitutes its will over its obligation to stare decisis." Lindell, 245 Wis. 2d 689, ¶148 (Ann Walsh Bradley, J., concurring).

¶78 Judicial elections do not change the law.  See Clarke, 410 Wis. 2d 1, ¶¶258, 262 (Rebecca Grassl Bradley, J., dissenting); Garner, supra, 415-16.  This court has made clear a change in the membership of this court is an illegitimate basis for reconsidering a prior decision——and at least two members of the majority have emphatically reiterated that point in their earlier writings,[8] only to forsake the principle with alacrity.

---

[8] St. Croix Cnty. Dep't of Health & Hum. Servs. v. Michael D., 2016 WI 35, ¶93, 368 Wis. 2d 170, 880 N.W.2d 107 (Abrahamson & Ann Walsh Bradley, JJ., dissenting); State v. Lynch, 2016 WI 66, ¶102, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part, dissenting in part); Koschkee v. Taylor, 2019 WI 76, ¶¶62, 70, 387 Wis. 2d 552, 929 N.W.2d 600 (Ann Walsh Bradley, J., dissenting) (joined by Dallet, J.); State v. Lindell, 2001 WI 108, ¶146, 245 Wis. 2d 689, 629 N.W.2d 223 (Ann Walsh Bradley, J., concurring); Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶110, 383 Wis. 2d 1, 914 N.W.2d 678 (Ann Walsh Bradley, J., dissenting); State v. Roberson, 2019 WI 102, ¶98, 389 Wis. 2d 190, 935 N.W.2d 813 (Dallet, J., dissenting) (joined by Ann Walsh Bradley, J.).

The justices forming the majority make no attempt to reconcile their prior writings with today's opinion. "[P]rinciples adopted when convenient, and ignored when inconvenient, are not principles at all. It is precisely when one's principles are tested and costly——yet are kept nonetheless——that they prove themselves truly held." Clarke, 410 Wis. 2d 1, ¶268 (Hagedorn, J., dissenting).

V

¶79 "[T]he Judge should never be the Legislator: Because, then the Will of the Judge would be the Law[.]" Rogers v. Tennessee, 532 U.S. 451, 476 (2001) (Scalia, J., dissenting) (internal quotation marks omitted) (quoting 1 M. Horwitz, Transformation of American Law 1780-1860, at 5 (1977)). The members of the majority in this case make their will the law, according four lawyers on the state's highest court the unchecked power to say what the law shall be, rather than what it is. The author of today's decree once deemed this court's analysis of the law as "downright dangerous to our democracy," Teigen, 403 Wis. 2d 607, ¶246 (Ann Walsh Bradley, J., dissenting), but the real danger lies in the new majority's arrogation of power the People never gave it. "[L]iberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments." The Federalist No. 78, at 523 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

¶80 Intense partisan politics saturate our nation, exacerbated by a lack of institutional trust. The legitimacy of

23

elections continues to be questioned, each side accusing the other of "election interference" and "threatening democracy" or even the very foundation of our constitutional republic. The majority's decision in this case will only fuel the fires of suspicion.

¶81 Whatever can be said of the majority's decision, it "is not the product of neutral, principled judging." Clarke, 410 Wis. 2d 1, ¶265 (Hagedorn, J., dissenting). Although the majority attempts to package its disagreements with Teigen as legal, the truth is obvious: The majority disagrees with the decision as a matter of policy and politics, not law. The members of the majority believe using drop boxes is good policy, and one they hope will aid their preferred political party. Teigen upheld the historical meaning of Wis. Stat. § 6.87(4)(b)1., which bars the use of offsite, unmanned drop boxes. The majority in this case overrules Teigen not because it is legally erroneous, but because the majority finds it politically inconvenient. The majority's activism marks another triumph of political power over legal principle in this court. I dissent.

¶82 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice BRIAN HAGEDORN join this dissent.